IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

AKIMA INTRA-DATA, LLC )
)
Plaintiff, )
) Case No. _____
v. )
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )

| PUBLIC REDACTED |
| VERSION |

## COMPLAINT FOR DECLARATORY
## JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff Akima Intra-Data, LLC ("AID"), by its undersigned counsel, hereby submits this

Complaint for Declaratory Judgment and Injunctive Relief.

### INTRODUCTION

1.     This action concerns an unlawful proposed contract award to ServiceSource, Inc.

("ServiceSource") by the Committee for Purchase from People Who Are Blind or Severely

Disabled (the "Committee") and the Department of Defense, National Geospatial-Intelligence

Agency ("NGA") under the Javits-Wagner-O'Day ("JWOD") Act, 41 U.S.C. §§ 8501-8506.

More specifically, the Committee and NGA have added the NGA-West Base Operations

Services Contract (the "BOS Contract") services to the AbilityOne Procurement List (the

"Procurement List" or "PL"), preventing AID or any other federal contractor from competing

for the services that now effectively belong to ServiceSource.[1]  Unless enjoined, the addition of

the BOS Contract services to the PL will violate the letter and the spirit of the JWOD Act, and

_____

[1] The Committee uses the PL to set aside commodities and services for award to particular not-for-profit
entities pursuant to the Javits-Wagner-O'Day Act and its implementing regulations. *See* 41 U.S.C.§§
8501-8506; 41 C.F.R. § 51-1.2.  The Committee operates day-to-day under the U.S. AbilityOne
Commission name.

its implementing regulations, will severely harm AID, and will substantially increase the cost of the services to the taxpayer; *all without helping the severely disabled*.

2.      The AbilityOne Program has as its Congressionally-stated goal, the generation of employment opportunities for the *severely disabled*, a *small* segment of the disabled population comprised of those with the most debilitating conditions.   (*Opportunities for too Few? Oversight of Federal Employment Programs for Persons with Disabilities,* Senate Hearing 109-360 at 4 (Oct. 2005), Ex. 1 (Committee Chairman acknowledging that the Act provides "very stringent definition of severe disability...focus[ing] on only a small portion of the disability population with the highest level of need.").)  In this regard, the Act defines severe disability to mean: "a physical or mental disability...[that] constitutes a substantial handicap to employment and is of a nature that prevents the individual from engaging in normal competitive employment."    41  U.S.C.  § 8501(5).    The  Committee's  regulations  define  "severely handicapped" to mean a person "who has a severe physical or mental impairment (a residual, limiting condition resulting from injury, disease, or congenital defect) which so limits the person's functional capabilities (mobility, communication, self-care, self-direction, work tolerance or work skills) that the individual is unable to engage in normal competitive employment over an extended period of time." 41 C.F.R. § 51-1.3.

3.      While creating jobs for the severely disabled is a laudable goal, the addition of the BOS Contract services to the PL does not serve that goal.  The BOS Contract covers the delivery of services in twelve performances areas (called annexes) related to the operation of the *highly-classified* NGA-West facility in St. Louis, Missouri.  The NGA-West facility, parts of which date back to the Civil War, does not meet Americans with Disabilities Act standards in

numerous respects.  The services provided range from classified waste handling to physician services.  Most of the positions have substantial physical, mental, and experience requirements. Moreover, nearly every position requires a *Top Secret/Sensitive Compartmented Information ("TS/SCI") security clearance with a counter-intelligence polygraph,* as the employees must work in direct proximity to our nation's most closely guarded secrets and critical intelligence systems.

4.     AID, an economically disadvantaged Alaska Native Owned corporation ("ANC"), has successfully performed the required services for the past 14 years, under two competitively-awarded contracts.  The BOS Contract ████████████████ is critical to AID's organizational identity and outlook.  ████████████████████████

████████████████████████████████████████████

████████████████████

5.     The actions of the Committee and NGA here transgress the JWOD Act and its purposes.  Purportedly in the name of helping the severely disabled, the Committee and NGA have substantially raised the cost of these services to the taxpayer, stripped AID of the opportunity to hold and compete for a company-critical contract, left AID's employees (many of whom have dedicated well over a decade to NGA) with the prospect of imminent unemployment, and harmed the Iñupiat people.  Only, there is *no chance* that the addition of this contract to the PL will create positions for the unemployed severely disabled.  With near certainty, there are *no* severely disabled, unemployed individuals in the St. Louis, Missouri area carrying TS/SCI security clearances, much less a sufficient number to fill 75% of the positions on the BOS Contract each fiscal year.  Indeed, existing Department of Defense security

████████████████████████████████

guidelines render it improbable that individuals meeting the JWOD Act's definition of severely disabled can obtain the necessary clearances.

6.      Given these facts, the actions of the Committee and NGA, not surprisingly, run afoul of numerous, specific requirements of the JWOD Act and its implementing regulations, including:

- Employment potential.   The JWOD Act implementing regulations require that the proposed addition of a commodity or service to the PL "*must* demonstrate a potential to generate employment for persons who are blind or have other severe disabilities." 41 C.F.R. § 51-2.4(a)(1) (emphasis added).   Here, the services (which require that nearly every contractor employee maintain a TS/SCI security clearance and undergo a counter-intelligence polygraph) do *not* offer the potential to generate employment for the *severely disabled*.   Even absent the TS/SCI security clearance requirements, the most basic job positions (*e.g.*, the janitorial and labor positions) have significant physical, mental, and experience requirements due to the need to work in direct proximity to national security data systems and information.   The addition of the BOS Contract services to the PL will not generate jobs for individuals meeting the definition of severely disabled.

- Nonprofit agency qualifications. A qualified nonprofit agency must *employ "blind or other severely handicapped individuals for not less than 75 per centum of the man-hours of direct labor required* for the production or provision of the commodities or services" that it proposes to perform. 41 U.S.C. § 8501(6)(C) (emphasis added).[2]   Despite the

---

[2] Congress has made clear that the requirement for 75% of the workforce to comprise persons who are blind or who have severe disabilities is crucial to the Program: "It is necessary to specify this requirement in the amended law for qualified nonprofit agencies for the blind and to also state a requirement for qualified nonprofit agencies for the other severely handicapped to assure that this preferential

express language of the JWOD Act, the Committee contends (though not by proper rule making) that it need not concern itself with the percentage of work that the particular services will generate for the severely disabled, so long as the nonprofit agency itself commits to employing 75% percent severely disabled across all of its business lines: "The JWOD Act has no requirement that each service involved in a contract be performed using a 75% disabled." 79 Fed. Reg. 22103-01 (Apr. 21, 2014) (notice adding BOS Contract to PL).  The error of this position is clear from the legislative history, *in which Congress rejected it*.  In any event, Janet Samuelson, President and CEO of ServiceSource, recently stated to Executive Leaders Radio: "Of ServiceSource's 3,000 employees, nearly 1,600 are individuals with disabilities" - begging the question how did ServiceSource meet the Committee's incorrect standard in any event.  (*See* Executive Leaders Radio Janet Samuelson for the Cause, Ex. 2.)

- Capability.  The nonprofit agency desiring to furnish a commodity or service on the PL "must satisfy the Committee as to the extent of the labor operations to be performed *and that it will have the capability to meet Government quality standards and delivery schedules by the time it assumes responsibility for supplying the Government.*" 41 C.F.R. § 51-2.4(a)(3) (emphasis added).  ServiceSource does not have the necessary capability to perform the highly classified services required by the BOS Contract using a severely disabled workforce.  Instead, ServiceSource apparently intends to staff the Contract in large measure using AID's incumbent workforce, none of whom meet the JWOD Act's

---

procurement program is, in fact, used to provide employment opportunities for blind and other severely handicapped individuals who are incapable of engaging in regular competitive employment.  As has been the practice, the 75 percent criterion is to be applied during the fiscal year in which the commodities or services are procured under the Act." (Amendments to the Wagner-O'Day Act, H. Rep. No. 92-228, at 14 (1971), Ex. 3.)

stringent definition of severely disabled.   Neither the Committee nor NGA could have reasonably found ServiceSource to have the necessary capability.

- Level of impact on the current contractor.   The Committee must consider the impact on the current contractor before adding services to the PL.   41 C.F.R. § 51-2.4(a)(4).   In conducting this inquiry, the JWOD regulations require the Committee to "give particular attention" to: (A) the possible impact on the contractor's total sales and (B) whether the contractor has been a continuous supplier to the Government of the specific commodity or service proposed for addition to the PL, and is, therefore, more dependent on the income from such sales to the Government.   41 C.F.R. § 51-2.4(a)(4)(i)(A), (B).   AID, which has performed the services for fourteen years (under two contracts), provided the Committee with extensive evidence regarding the particular significance of the Contract to AID (including economic data), AID's employees, and the Iñupiat Eskimo owners of AID.   Indeed, AID submitted economic data evidencing that Contract No. HM1575-09-C-0009 (the current BOS Contract) accounts for approximately █████% of AID's total revenues for FY13 and will account for ████% of its total revenues in FY14. AID further demonstrated that the Alaska Native Claims Settlement Act ("ANCSA") requires that federal entities "for all purposes of federal law" treat AID as "economically disadvantaged."   *See* 41 U.S.C. § 1626(e).   Separately (but also relevant), AID demonstrated that the Small Business Act and its implementing regulations make clear that ANC-owned business are not affiliates of each other for federal contracting purposes. 13 C.F.R. § 121.103(b)(2)(i); *see also* 15 U.S.C. § 636(j)(10)(J)(ii)(II). ███████████

████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████

7.     AID, accordingly, respectfully requests that the Court: (a) declare that the Committee's addition of the BOS Contract services to the PL violates law and regulation and is otherwise arbitrary and capricious; (b) declare that NGA's actions in support of the addition of the BOS Contract services to the PL and in support of an award to ServiceSource violate law and regulation and are otherwise arbitrary and capricious; (c) declare that NGA may not lawfully solicit ServiceSource (or its named subcontractor CW) or contract for the BOS Contract services with ServiceSource (or its named subcontractor CW) absent a proper competition in which ServiceSource prevails; (d) issue preliminary and permanent injunctive relief setting aside or enjoining the addition of the BOS Contract services to the PL; and (e) issue preliminary and permanent injunctive relief enjoining NGA from awarding the BOS Contract services to ServiceSource (or its named subcontractor CW) absent a lawful, full and open competition.

## THE PARTIES AND OTHER RELEVANT ENTITIES

8.     Plaintiff AID is a wholly owned subsidiary of NANA Regional Corporation, Inc. ("NANA"). NANA is an Alaska Native Corporation ("ANC") established by Congress in 1971 pursuant to ANCSA. P.L. 92-203, 85 Stat. 688 (codified, as amended, at 43 U.S.C. §§ 1601-1629h). In turn, the 13,000 shareholders of NANA are the Iñupiat, a circumpolar indigenous people of Alaska's Northwest Arctic and North Slope boroughs and the Bering Straits region. Nearly all of the NANA region is above the Arctic Circle. Pursuant to ANCSA, the Iñupiat, along with many other Alaska Natives, relinquished to the U.S. Government their rights to substantial, natural resource-rich Alaskan lands that they had inhabited for thousands of years.

███████████████████████████████████████████

███████████████████████████████████████████

In return, the Alaska Natives received commitments from the United States designed to allow Native Alaskans to participate in the national economy. The Iñupiat, many of whom live far below the federal poverty level, rely on NANA for dividend distributions, training, and direct financial assistance.

9.    AID has its principal places of business at 909 West 9th Avenue, Anchorage, Alaska 99501 and 13873 Park Center Road, Suite 400N, Herndon, Virginia 20171. AID provides professional services, including data and records management, training and training development, information technology, administrative support, facilities operations and management, and base operations support to the Federal Government. AID is the favorably performing incumbent contractor for the services in question.

10.    Defendant, the Committee, is an independent agency of the United States, composed of 15 members appointed by the President. 41 U.S.C. § 8502(b); 41 C.F.R. § 51-2.1. The Committee carries out various functions in support of its mission to provide employment and training opportunities for persons who are blind or have other severe disabilities, and whenever possible, preparing those individuals to engage in competitive employment. 41 C.F.R. § 51-2.2. These functions include: determining which commodities and services procured by the Federal Government are suitable to be furnished by qualified nonprofit agencies employing persons who are blind or have other severe disabilities and adding those items to the PL; determining fair market prices for items added to the PL; and monitoring nonprofit agency compliance with Committee regulations and procedures. 41 C.F.R. § 51-2.2.

11.    Defendant NGA is a federal agency responsible for providing timely, relevant, and accurate geospatial intelligence in support of national security. *(See*

https://www1.nga.mil/About/NGAStrategy/Pages/default.aspx.)    NGA    supports    multiple

mission areas, including support to military and intelligence operations, intelligence analysis,

homeland defense, and humanitarian disaster relief.  NGA also focuses on counterterrorism,

counterproliferation, cyber, anti-access/area denial, and global coverage.  NGA is a member of

the Intelligence Community and, due to the classified nature of the work that NGA performs, all

NGA employees and contractor employees requiring access to NGA facilities must be eligible

for a TOP SECRET/SCI security clearance and must undergo a polygraph examination.

Because of this, NGA warns that the hiring process can take "longer than most people might

expect," even more than one year.    (*See* https://www1.nga.mil/Careers/FAQs/Pages/

Employment.aspx.)

     12.    ServiceSource, a related non-party entity, is a nonprofit disability resource

organization that purportedly employs people with disabilities on government and commercial

employment contracts. (*See* ServiceSource website, http://www.servicesource.org/ about-us.)

## JURISDICTION, VENUE, AND STANDING

     13.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b), as this

matter relates to a challenge by AID (the incumbent provider and an interested party) to a

"proposed contract or to a proposed award or the award of a contract" and to various violations

of "statute or regulation in connection with a procurement or a proposed procurement."

     14.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1491(b).

     15.    AID has standing to challenge the actions of the Committee and NGA because the

decision of the Committee and NGA to strip AID (the incumbent provider) of the opportunity to

compete for the involved services and instead to arbitrarily set the services aside for a sole

source contract award to ServiceSource has harmed AID's direct and cognizable interests.  28 U.S.C. § 1491(b)(1).

## LIMITED FACTUAL BACKGROUND

### The JWOD Act And The AbilityOne Program

16.    The JWOD Act authorizes the AbilityOne Program to increase employment and training for persons who are blind or have other *severe disabilities*.  41 U.S.C. §§ 8501-8506; 41 C.F.R. § 51-1.3.  The Program pursues its goal by setting aside certain federal contract work for sole source purchase from nonprofit agencies employing the blind or severely disabled.  *Id.*

17.    The JWOD Act establishes the Committee, which is comprised of 15 presidentially appointed members representing government agencies and private citizens. 41 U.S.C. § 8502.

18.    The Committee implements the JWOD Act by establishing and publishing in the Federal Register a PL of commodities and services that agencies must procure from a qualified nonprofit agency for the blind or severely disabled.  41 U.S.C. § 8503; 41 C.F.R. § 51-2.2; 41 C.F.R. § 51-2.5.

19.    Once the Committee adds a commodity or service to the PL, agencies must purchase the supplies or services from JWOD-participating nonprofit agencies.  41 U.S.C. § 8504(a); 41 C.F.R. § 51-2.2(e); 41 C.F.R. § 51-2.8(a); FAR 8.704(b); FAR 9.107(a).

20.    Prior to adding a commodity or service to the PL, the Committee must assess whether the commodity or service is suitable to be furnished by a qualified nonprofit agency employing persons who are blind or have other severe disabilities.  41 U.S.C. § 8503(a)(1); 41 C.F.R. § 51-2.2(b).

21.    For a commodity or service to be suitable for addition to the PL, each of the following criteria must be satisfied:

(1)  Employment potential.   The proposed addition must demonstrate a potential to generate employment for persons who are blind or have other severe disabilities.

(2)  Nonprofit agency qualifications.   The nonprofit agency (or agencies) proposing to furnish the item must qualify as a nonprofit agency serving persons who are blind or have other severe disabilities, as set forth in part 51-4 of chapter 41 of the Code of Federal Regulations.

(3)  Capability.   The nonprofit agency (or agencies) desiring to furnish a commodity or service under the AbilityOne Program must satisfy the Committee as to the extent of the labor operations to be performed and that it will have the capability to meet Government quality standards and delivery schedules by the time it assumes responsibility for supplying the Government.

(4)  Level of impact on the current contractor for the commodity or service.

(i)  In deciding whether or not a proposed addition to the Procurement List is likely to have a severe adverse impact on the current contractor for the specific commodity or service, the Committee gives particular attention to:

(A)  The possible impact on the contractor's total sales, including the sales of affiliated companies and parent corporations.   In addition, the Committee considers the effects of previous Committee actions.

(B)  Whether that contractor has been a continuous supplier to the Government of the specific commodity or service proposed for addition and is, therefore, more dependent on the income from such sales to the Government.

(ii)  If there is not a current contract for the commodity or service being proposed for addition to the Procurement List, the Committee may consider the most recent contractor to furnish the item to the Government as the current contractor for the purpose of determining the level of impact.

41 C.F.R. § 51-2.4(a).

22.    The Committee also must publish a notice in the Federal Register announcing a proposed addition or deletion of a commodity or service to or from the PL, and provide

interested persons an opportunity to comment on the proposal.  41 C.F.R. § 51-2.3; 41 C.F.R. § 2.4(b).

23.   Pursuant to its suitability analysis, the Committee may decline to add a service or commodity to the PL based upon the adverse impact of that action on a current contractor.  41 C.F.R. § 51-2.5.   The adverse impact regulation requires the Committee to consider "**the particular facts and circumstances in each case**," forgoing the application of a standard test. *Id.* (emphasis added).  The regulation makes no mention of the circumstances under which the Committee might treat companies as affiliates (a topic of complex federal contracting regulations where affiliation is examined - *e.g.*, 13 C.F.R. § 121.103).

24.   If the Committee determines that a product or service is suitable for addition to the PL, the Committee designates a JWOD-participating nonprofit agency as the mandatory source under the AbilityOne Program for the procurement of the commodity or service in question.  41 C.F.R. § 51-2.8(a).  Under applicable provisions of the FAR, the Committee "is required to find an AbilityOne participating nonprofit agency capable of furnishing the supplies or services before the nonprofit agency can be designated as a mandatory source under the AbilityOne Program."  FAR 9.107(a).

25.   The Committee relies upon its "central nonprofit agencies," SourceAmerica and NIB, to allocate sole source contracts for the commodities or services on the PL among nonprofit agencies that employ persons who are blind or have other severe disabilities.  41 C.F.R. §§ 51-1.3, 3.1, 3.4.

26.   Thus, in order for a nonprofit agency to receive a contract under the AbilityOne Program, one of the Committee's central nonprofit agencies must represent the nonprofit agency. 41 C.F.R. § 51-4.1.

27.   SourceAmerica charges substantial fees to the nonprofit agencies that it represents for facilitating their participation in the AbilityOne Program. 41 C.F.R. § 51-3.5. SourceAmerica calculates its fees based on the participating nonprofit agency's sales to the Government under the AbilityOne Program. *Id. See also McGregor Printing Corp. v. Kemp*, 20 F.3d 1188, 1192 (D.C. Cir. 1994) (noting that NISH, now known as SourceAmerica, received a four percent commission on the contracts awarded to the nonprofit agencies).

28.   Despite that SourceAmerica is paid when one of its constituent nonprofit agencies receives a contract under the AbilityOne Program (creating an inherent conflict), SourceAmerica is charged with evaluating the qualifications and capabilities of the nonprofit agencies that it represents. 41 C.F.R. § 51-3.2(b). SourceAmerica (despite a manifest financial conflict of interest) must make recommendations to the Committee regarding such qualifications and capabilities, the appropriate prices for supplies or services, and price changes for commodities or services on the PL. 41 C.F.R. § 51-3.2(i).

29.   Although SourceAmerica evaluates the qualifications and capabilities of the non-profit agencies that it represents, the Committee remains ultimately responsible for "monitor[ing] nonprofit agency compliance with Committee regulations and procedures." 41 C.F.R. § 51-2.2(d).

**The BOS Contract And AID's Performance**

30.     The BOS Contract requires the contractor to operate and maintain the entirety of the extensive, highly-classified NGA West Campus in St. Louis, Missouri.[3]

31.     The NGA-West facility consists of multiple buildings, some of which are separated by distances of up to 100 yards. (*See* Current BOS Contract PWS and Annex Excerpts, PWS Attach. 1 at 1.2.1, p. 5, Ex. 4 ("Contractor shall support geographically separated units (GSUs) that are part of the NGA West organization.").)[4] Over 75,000 square feet of the NGA-West facilities comprise data center floor space. The servers housed in the data centers provide essential, 24/7 support to NGA and other agencies, including the Air Force, the Navy, the Marine Corps. The data centers provide a constant electronic stream of civilian and military maritime and aeronautical navigation data. The BOS contractor (among other things) supports these data centers.

32.     The BOS Contract services comprise twelve discrete performance areas (called annexes), each with its own performance work statement. The following chart identifies each annex and provides a small number of examples of the work required by the performance work statements for each of the annexes:

---

[3]   In May 2013, NGA issued a draft solicitation for the BOS Contract recompetition. *See* https://www.fbo.gov/index?s=opportunity&mode=form&id=d9f251114240af27f0fe8f89b2b98a3a&tab=c ore&_cview=1. NGA never finalized the draft solicitation. In describing the nature of the services at issue, this Complaint cites to both the BOS Contract and the draft solicitation, which are substantially similar to one another.

[4] *See also* Draft Solicitation, PWS for Base Operations Support Contract at Attachment 1, p. 5.

| Annex 1 Classified Waste Disposal, Recycling, Fleet Management, Material Handling, And Warehouse Management | 1.8.2 Special Handling/Storage. The Contractor shall segregate, safeguard and process material requiring special handling, to include but not limited to weapons, classified items, sensitive items, pilferable items, Electronic Sensitive Device (ESD) items, and hazardous material (HAZMAT). The Contractor shall place received items into the assigned storage area, and shall maintain them in a serviceable condition, so as to safeguard package integrity and ensure the items remain undamaged. |
|---|---|
| Annex 2 Freight Management And Mail Services | 2.3.3. X-Ray Facility. The Contractor shall furnish its employees working in the vicinity of this scanner with dosimeter badges used to detect radiation leakage.<br><br>2.6.3. Opening of All Letter and Flat Mail. …The Contractor shall use safe work practices, such as wearing gloves and long sleeves, to open all non-suspicious sealed letter-size and flat-size mail and perform a physical inspection looking for suspicious powder residue. The physical inspection shall be accomplished with a minimal amount of movement of the opened envelope, which may include gently tapping but not briskly shaking, or having the contents removed while the Contractor inspects….Any mail deemed safe by the Contractor but that could look suspicious to the intended recipient shall be identified on the exterior by words such as "Contents Inspected and Deemed Safe." The Contractor shall also attempt to contact the recipient by a phone call or email, explaining what was observed and how the contents were deemed safe. |
| Annex 3 Property Inventory, Accountability, Management, & Disposition | 3.1. SCOPE: Perform all operations associated with establishing and maintaining accurate, automated, and complete records for all NGA West real and personal property. This includes the requirement to manage both classified and unclassified accountable property equipment in accordance with equipment management and security regulations and complements DoD accounting and financial reporting requirements; provides property accountability using Defense Property Accountability System (DPAS) and the Radio Frequency Identification accountability system (RFID); provides computer user administrator support for both the DPAS and the RFID system.<br><br>3.6.1. Qualifications. The primary Contractor person working on this annex shall have a minimum of two years experience working in the field of real property management at a Department of Defense military site. The individual shall have experience with both spreadsheet and database software. |
| Annex 4 Janitorial Services | 4.3 STORAGE AREAS/JANITORIAL CLOSETS. …The Contractor shall ensure that unsanitary and hazardous conditions do not exist or such conditions are immediately corrected when discovered.<br>4.9.7: Shampooing. …The Contractor shall provide personnel trained in shampooing Raised Floor with Carpet operations and methods in accordance with Industry Standards. The Contractor shall exercise special |

| | care when shampooing Raised Floor with Carpet. |
|---|---|
| Annex 5<br><br>Physician And Occupational Health Nurse Services And Optical And Optometrist Services | 5.1 SCOPE. The Contractor shall provide Licensed Occupational Health Physician services (hereinafter referred to as Physician) services and Registered Professional Nurses (RN) services for NGA West to support an occupational health program for Government employees.  The Contractor shall provide optical and optometrist services... |
| Annex 6<br><br>Security Services | 6.1 SCOPE. The Contractor shall perform Sensitive Compartmented Information Facility (SCIF) services, Workforce Support Center and Key Control, Security Access Control Services, Antiterrorism and Force Protection (AT/FP) Services, Visitor Control services, and Conference Center Control Services.<br>6.2.5. Physical Security. ...Conduct random security walk-around inspections to ensure classified information is being properly protected. Findings will be reported to the St. Louis Site Security Office or COR and will include the building(s) and floor(s) checked and any discrepancies noted.<br>6.2.6 Security Alarms. ...respond to and investigate alarms, security zone problems, and systems tests within 10 minutes to determine if the alarm is considered an "unauthorized entry" or "false alarm."<br>6.4.3 Security Escorts. The Contractor shall provide security escorts to ensure the uncleared personnel to whom they are assigned are monitored at all times, have no exposure to classified data, and comply with security regulations.<br>6.4.5 Responsibilities During Emergency Situations. ...In emergency situations such as fire, bomb threats, emergency evacuation, etc., security escorts will take direction from the appropriate security personnel.  The security escorts shall ensure the persons they are responsible for are aware of proper emergency evacuation procedures.   During any emergency evacuation the security escorts shall escort the visitor/contractor to the area designated for contractors via access control points.  They shall perform escort access control duties as personnel return into the facility. |
| Annex 7<br><br>Snow And Ice Removal Grounds Maintenance Roads And Grounds Integrated Pest Management And Refuse Collection | 7.5.1 Requirements. ...Services shall include control of interior and exterior rats and mice, interior and exterior nuisance birds, stray dogs and cats, skunks, squirrels, snakes or other occasional intruders. The Contractor shall be responsible for removal and disposal of animal carcasses discovered on the facilities, including all grounds. |

| | |
|---|---|
| Annex 8<br><br>Facilities Equipment Operations And Maintenance Services | 8.5.1 Facility Coverage. The Contractor shall provide at least one on-site technician at both the Arnold and 3200 South Second Street locations to provide 24x7 coverage, 365 days per years. Technicians shall be able to respond to critical HVAC issues and emergency calls.<br><br>8.18.1. EMCS Operations. The Contractor shall provide adequately trained personnel to operate, monitor, and maintain the Energy Monitoring and Control System (EMCS) 24 hours per day, seven days per week to assure proper equipment operation, facility monitoring, and response to alarms generated by the EMCS... |
| Annex 9<br><br>Space Management Services | 9.1. SCOPE. This annex describes the requirements for the management and execution of space management services to include all construction, systems furniture, as as-built maintenance/CAD services.  The work includes, but is not limited to, assisting in all aspects of engineering design regarding the development of drawings and specifications, developing and executing Government-selected facility projects pertaining to maintenance, repair and/or construction at NGA-West with individual project construction costs up to an approximate value of $700,000.00. The work also includes providing various Computer Aided Design (CAD) services and services pertaining to systems furniture layout, installation, removal and storage for NGA-West. |
| Annex 10[5]<br><br>Customer Support, Conference Center, Protocol And Management Support Services | 10.2.2. CONFERENCE AND EVENT SERVICES. The Contractor shall schedule all Events/Conferences held primarily in the NGA West Conference Center but may be held at either West facility. The Contractor shall work with Agencies and organizations that are both internal and external to NGA. The Contractor shall be responsible for scheduling all aspects to include Ground Transportation (Commercial Bus Transportation, taxi cabs, etc.), scheduling and coordinating Informational Technology (IT) support, coordinating with Security for passing clearances, reserving parking, facility access, coordinating catering services, room set up, etc., When scheduling conflict arises, the Contractor shall work towards an acceptable conclusion. If resolution cannot be reached the Contractor shall work with the Customer Support Office.<br><br>10.2.14.1.   ADMINISTRATIVE   DUTIES:   ...Duties   include   or   are comparable to the following...In the NGA official's absence, ensures that requests for action or information are relayed to the appropriate staff member, as needed, interprets request and helps implement action, makes sure that information is furnished in a timely manner, decides whether NGA official should be notified of important or emergency matters. |
| Annex 11[6]<br><br>Creative Services | 11.3 RECOMMENDED EXPERIENCE AND SKILLS. Recommended employees providing graphic design support have a minimum of two years of graphic design experience or equivalent education.  Recommended the |

---

[5] In the draft Solicitation, Annex 10 is called "Customer Support, Conference Center, And Management Support Services".

[6] The draft Solicitation does not include the Creative Services Annex.

| | |
|---|---|
| | employee providing photographic support have a minimum of five years of photographic experience or equivalent education. The Contractor shall keep abreast of rapidly evolving changes and advancements in the computer hardware, software environment affecting graphic design, multimedia and photography…When necessary, the Contractor may exercise limited control over the substance of events to be photographed by staging actions, suggesting behavior of the principals, and rehearsing activities before photographs are taken. |
| Annex 12[7]<br><br>Safety, And Emergency Preparedness | 12.2.4 <u>Hazard Abatement Program</u>. The Contractor shall conduct an investigation of verbal/written reports of imminent danger hazards within 30 minutes of notification; reports of serious hazards by the end of the workday; and reports of all other hazards within three (3) workdays. The Contractor shall verbally report to the COR all imminent and serious hazards within 30 minutes of investigation completion. The Contractor shall assess reported hazards to formulate possible corrective actions.<br><br>12.3.1. <u>Duties include but are not limited to.</u> …ensure Contractor employees assigned to the Incident Management Team (IMT) are trained (Tech Exhibit 4), equipped and prepared to respond to an emergency or disaster…<br><br>12.3.3. <u>Exercises and Drills.</u> …The Contractor shall be a main participant in fire and tornado drills. |

33.     Given the access to highly classified data required of all positions, NGA requires that nearly all BOS Contract personnel possess a TS/SCI security clearance.  (Current BOS Contract PWS and Annex Excerpts, PWS Attach. 1 at 1.2, p. 5, Ex. 4 ("All Contractor personnel requiring access to the installation on a routine basis shall have the Core Access TOP SECRET//NATO SECRET//SI-G/TK security clearance, unless otherwise stipulated in the individual annex."))[8] ███████████████████████

███████████████████████████████████████████████

███████████████████████████████

34.     The NGA website explains why a TS/SCI security clearance is required and what obtaining such clearance entails:

---

[7] In the draft Solicitation, Annex 11 covers Safety and Emergency Preparedness.
[8] *See* Draft Solicitation, at Attachment 1 p. 5, Section 1.2.

███████████████████████████████

Because of the classified nature of our work at NGA, all candidates must be eligible for a TOP SECRET/SCI security clearance and must take a polygraph examination. In order to obtain the required security clearance, candidates must undergo a thorough personnel security background investigation that examines a candidate's life history, character, trustworthiness, reliability and soundness of judgment. The background investigation includes a review of previous and current employment history (including contact with the candidate's current employer), verification of education credentials and residential history, and interviews with knowledgeable sources such as friends, neighbors, supervisors, and coworkers. Depending on your situation, the background investigation process may take two-and-one-half months or longer. Investigators will also examine the potential for conflicts of interest, potential to be coerced, and the candidate's willingness and ability to abide by regulations governing the use, handling, and protection of sensitive information. In addition, credit bureau and criminal background checks are conducted to ensure that all candidates meet the high personnel security standards set by NGA and the Intelligence Community.

(*See* https://www1.nga.mil/Careers/ApplicationProc/Pages/SecurityClearanceProcess.aspx.)

35.    The National Security Agency advises that persons undergoing a CI polygraph must be in "good physical and mental health." (*See* http://www.nsa.gov/careers/_files/poly_brochure.pdf.) According to the U.S. NGA Counterintelligence Handbook, certain physical and mental conditions render a person unsuitable for a CI polygraph test:

*Certain mental or physical conditions may influence a person's suitability for polygraph examination and affect responses during testing.* CI agents should report any information they possess concerning a person's mental or physical condition to the polygraph examiner before scheduling the examination. *Typical conditions of concern are--*

*(1) Mental disorders of any type.*

(2) Any history of heart, respiratory, circulatory, or nervous disorder.

*(3) Any current medical disorder*, to include colds, allergies, or other condition (such as pregnancy or recent surgery).

(4) Use of drugs or alcohol before the examination.

(5) Mental or physical fatigue.

(6) Pain or discomfort.

(U.S. NGA Counterintelligence Handbook at A-III-7 (emphasis added).)

36.    According to the Department of Defense, Defense Security Service ("DDS"), applicants for personnel security clearances submitted by contractors are first considered for interim eligibility, using the same guidelines that apply when considering whether to grant a final personnel security clearance.  DSS reports that the most common reasons for denial of interim security clearances include "Emotional, Mental and Personality Disorders" or "information that suggests that an individual has a condition or treatment that may indicate a defect in judgment, reliability or stability."   (*See* http://www.dss.mil/psmo-i/indus_psmo-i_interim.html.)

37.    Focusing on janitorial services, where ServiceSource purportedly intends to employ the severely disabled, the BOS Contract requires the contractor's janitorial staff to do more than provide cleaning services.  They must mobilize to address any emergency situations that may arise at the NGA-West facilities:

> 4.2:  <u>EMERGENCIES</u>.   During emergency situations requiring immediate attention (e.g., flooding, etc), the Contractor shall divert the workforce to the emergency.

(Current BOS Contract PWS and Annex Excerpts, Annex 4 at p. 4, Ex. 4.)[9]

38.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[9] *See* Draft Solicitation at Attachment 1, Annex 4, p. 4, Section 4.2.

███████████████████████████████████



39.    AID has performed the BOS Contact services successfully since 1999 pursuant to two competitive awards.  Most recently, in 2009, NGA again selected AID as the best value provider for these services, following a full and open competition.  Thus, AID has provided these base operations services for the past fourteen years.

40.    On the current Contract, AID has performed well, averaging a ██% award fee percentage.

41.  The BOS Contract accounted for approximately ███% of AID's revenue in 2013 and AID projects that, ██████████ ██████, this percentage will increase to approximately ██% in 2014.

### AID's Objection, The Committee Action, And Response

42. On May 8, 2013, NGA published on FBO.gov a request for comment regarding its upcoming planned full and open re-competition of the BOS Contract. (*See* Special Notice dated May 8, 2013, HM1575-13-R-0012, Ex. 6.) The Notice did not indicate any intent to transition the services to the AbilityOne Program. Instead, the Notice provided a draft PWS covering Annexes 1-11 for the base operations services.

43. Significantly, the Notice made clear that bidders would have to carry a minimum TS Facility Clearance and that the "[t]he minimum required personnel clearance is TS/SCI for all services under the contract." *Id.*

44. On October 18, 2013, NGA updated its FBO.gov notice to indicate its consideration of the AbilityOne Program to deliver the BOS Contract services.

45. On October 22, 2013, AID received a letter from the Committee stating that the Committee was considering adding the BOS Contract services to the PL. (Letter from Committee to AID dated October 22, 2013.) The Committee requested that AID complete a Contractor Data Form for the Committee to assess whether or not adding the BOS Contract services to the PL would have a severe adverse impact on AID. (*Id.*) The Committee also permitted AID to submit other comments. (*Id.*)

46. On November 5, 2013, AID, by counsel, timely provided an extensive written response to the Committee's letter opposing the addition of the Contract services to the PL. (*See*

AID Letter to the Committee dated November 5, 2013 (without exhibits), Ex. 7.)   AID explained in detail that the addition of the BOS Contract services to the PL would (among other things): (a) cause AID significant economic harm not only by the direct loss of the Contract but also by impairing AID's ability to compete for similar contracts in the future on the basis of its exemplary performance record; (b) be inappropriate because a person with severe disabilities cannot perform the BOS Contract services; (c) compromise the quality of services that are critical to NGA; and (d) cause the Committee to violate the ANCSA by stripping the Contract from an ANC minority-owned and operated business enterprise and an economically-disadvantaged contractor.  Pursuant to the Committee's regulations at 41 C.F.R. § 51-2.9, AID requested the opportunity to appear before the Committee to further address its concerns.

47.

48.

49. ██████████████████████████████████

██████████████████████████

50. ██████████████████████████████████

████████████████████████████████

51.     On April 21, 2014, the Committee published a notice in the Federal Register announcing the Committee's decision to add the services to the PL effective May 20, 2014 and designating ServiceSource as the recipient of the work. (*See* 79 Fed. Reg. 22103, Ex. 10.)

## COUNT I
**The Committee Improperly Added The Services To The PL**

52.     AID incorporates paragraphs 1-51 of the Complaint by reference herein.

53.     The JWOD Act and its implementing regulations require the Committee to consider certain enumerated factors in determining whether to add a commodity or service for addition to the PL. *See* 41 C.F.R. § 51-2.4.  These include: (a) the employment potential created for persons who are blind or have other severe disabilities; (b) the qualifications of the nonprofit agency proposing to provide the services in question; (c) the capability of the nonprofit agency to meet the Government quality standards and delivery schedules by the time it assumes responsibility for supplying the contract; (d) the level of impact on the current contractor; and (e) other information deemed pertinent, such as comments on a proposal published in the Federal Register to add the services to the PL.  41 C.F.R. § 51-2.4(a), (b).

54.     The JWOD regulations also require the Committee to "monitor nonprofit agency compliance with Committee regulations and procedures."  41 C.F.R. § 51-2.2(d).

55.     Here, the Committee failed to properly and rationally consider the required factors under the JWOD Act and its implementing regulations.  The Committee's violations of the Act

████████████████████████████████████

and its regulations and arbitrary decision-making independently and collectively yielded an unreasonable decision to add the BOS Contract services to the PL for performance by ServiceSource and prejudiced AID.

### Count I(a):  The Committee Cannot Add The BOS Contract To The PL Because ServiceSource Cannot Perform "The Services" Using A 75% Severely Disabled Workforce "Each Fiscal Year" As Required By The JWOD Act

56.     The JWOD Act requires as a matter of qualification that a nonprofit agency use the severely disabled for no less than 75% of the direct labor hours to perform "the services" each fiscal year:

> The term qualified agency means, among other things, an agency:
>
> (C) that in the production of products and in the provision of services (whether or not the products or services are procured under this chapter) during the fiscal year employs blind or other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products or services.

41 U.S.C. § 8501(6).

57.     Notwithstanding this clear requirement, AID understands that the Committee intends to grant a multi-year waiver to ServiceSource with respect to the statutory requirement to employ a 75% severely disabled workforce on the BOS Contract.  Indeed, the Committee's Federal Register notice disavows the requirement entirely: "The JWOD Act has no requirement that each service involved in a contract be performed using a 75% disabled workforce."  (79 Fed. Reg. 22103, Ex. 10.)  The Committee (adopting an argument contradicted by the JWOD Act and rejected previously by the United States Court of Appeals for the District of Columbia) asserts instead that the JWOD Act permits the Committee to measure the 75% across the entire nonprofit agency in a given fiscal year.  *Id.*; *see also McGregor Printing Corp. v. Kemp*, 20 F.3d 1188, 1195 (D.C. Cir. 1994) ("We do not believe these gaps are filled by the argument, made

here and in the district court, that neither the Act nor the Committee's regulations require the workshops to use 75 percent blind labor to produce any single commodity…").

58.     The JWOD Act requires that a nonprofit agency employ the severely disabled for not less than 75% of the labor hours each year "for the provision of **the services**." 41 U.S.C. § 8501 (bold added).  In other words, *the services performed by ServiceSource* under the BOS Contract must comply with the statutorily-required 75% ratio each fiscal year.    Under ServiceSource's intended approach, the severely disabled will perform *almost none* of the services performed under the BOS Contract.  It makes no sense for ServiceSource to receive a sole source award for services that it will not perform with any severely disabled direct labor.

59.     Congress inserted the 75% ratio requirement into the JWOD Act to ensure that the AbilityOne program actually operates for the benefit of the severely disabled.  Indeed, in the early 1970s, Congress became aware of pervasive abuses occurring in the AbilityOne program because the Committee had begun to interpret the statute's 75% ratio as applying not to each article produced by a nonprofit agency, but rather to "all articles" produced by the nonprofit - the very approach advanced by the Committee here.  This meant that nonprofit agencies could meet the 75% requirement with a few large *low wage* contracts, and then receive additional, highly lucrative sole source contracts under which few, if any, severely disabled people were employed.  John Nagle, President of the Federation for the Blind, testified before Congress that "under [the Committee's] interpretation, it is possible for a shop to do a vast amount of business and yet on some jobs have no blind and ultimately no severely handicapped people employed at all."  (Amendments to the Wagner-O'Day Act: Hearings Before the Subcomm. on Gov. Ops., 92nd Cong. (1971) at 99, Ex. 11).  He objected to the Committee's position as harmful to the

blind and severely disabled and recommended that Congress clarify that the ratio applies on a service-specific basis: "it should be 75-25 percent ratio on any commodity, on any service provided. Not on the totality of all work done in the shop." (*Id.*) Congress agreed, and amended the statute:

> It is necessary to specify this requirement in the amended law for qualified nonprofit agencies for the blind and also to state a requirement for qualified nonprofit agencies for the other severely handicapped *to assure that this preferential procurement program is, in fact, used to provide employment opportunities for blind and other severely handicapped individuals who are incapable of engaging in regular competitive employment*.

(Amendments to the Wagner-O'Day Act, H. Rep. No. 92-228, 92nd Cong. at 14 (1971) (emphasis added), Ex. 3.) To avoid any confusion, Congress directed the Committee to place on the PL "the services." 41 U.S.C. § 8503(a)(1)(8). Moreover, Congress defined direct labor as "all work...directly relating to the performance of a service[.]" 41 U.S.C. § 8501(3)(A).

60. Likewise, the Committee cannot waive the JWOD Act's requirement that a nonprofit agency meet the 75% ratio for each service *per fiscal year*. If Congress wanted the Committee to grant waivers, Congress would not have referred to the "fiscal year" in the statute. *Id.*

61. Congress spoke to the issue again in 1974, reiterating that the 75% ratio applies on a per-commodity basis: "In order to be eligible, a workshop must have seventy-five percent of the direct labor involved in making a commodity performed by blind or visually handicapped workers." (Amendments to the Javits-Wager-O'Day Act, S. Rep. 93-908, 93rd Cong. (Jun. 10, 1974) at 2, Ex. 12.)

62. Congress intends the Committee to apply the 75% ratio to each service and each commodity that it adds to the PL.

63.     The Committee must implement the statute as written. *Alabama Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979) (an agency is not "free to ignore the plain meaning of the statute and to substitute its policy judgment for that of Congress.").

64.     The Committee, accordingly, cannot justify removing a multi-million dollar federal contract from competition when ServiceSource cannot meet the JWOD Act's requirements related to the services for several years, if ever.

**Count I(b): The Committee Did Not Rationally Consider The Employment Potential Of Adding The BOS Contract Services To The PL**

65.     Regardless of the 75% rule, the regulations require the Committee to consider whether a proposed addition to the PL has a demonstrated potential to generate employment for persons who are blind or have other severe disabilities. 41 U.S.C. § 8503(a); 41 C.F.R. § 51-2.4(a)(1).

66.     By statute, severely disabled "means an individual…under a physical or mental disability…which…constitutes a substantial handicap to employment and is of a nature that prevents the individual from currently engaging in normal competitive employment." 41 U.S.C. § 8501(5). The implementing regulation adds to this definition that severely disabled means a "severe physical impairment (a residual, limiting condition resulting from an injury, disease, or congenital defect) which so limits the person's functional capabilities (mobility, communication, self-care, self-direction, work tolerance or work skills) that the individual is unable to engage in normal competitive employment over an extended period of time." 41 C.F.R. § 51-1.3. The definition specifically excludes a person whose disability "has been overcome" or "substantially corrected." *Id.* The Committee itself has acknowledged that Congress established a "very stringent definition of severe disability…focus[ing] on only a small portion of the disability

population with the highest level of need." (*Opportunities for too Few? Oversight of Federal Employment Programs for Persons with Disabilities,* Senate Hearing 109-360 at 4 (Oct. 2005) (Committee Chairman testifying), Ex. 1.)

67.    NGA requires that nearly all BOS Contract personnel possess a TS/SCI security clearance. Accordingly, AID's job descriptions include this requirement, even for janitorial services. (AID Job Descriptions, Ex. 5.) In particular, AID's job descriptions require that all contractor personnel pass a CI polygraph. (*Id.*)

68.    A comparison of the existing requirements for a TS/SCI security clearance with a counterintelligence polygraph and Congress' very stringent definition of severe disability under the Act renders it all but a virtual certainty that *there are no* unemployed, severely disabled individuals in the St. Louis area, qualified to perform the BOS Contract services who carry a TS/SCI security clearance.

69.    Even were TS/SCI clearance requirements not necessary, the BOS Contract jobs would remain inappropriate for inclusion on the PL. The BOS Contract requires a wide range of highly-skilled services with significant qualification requirements. No pool of unemployed, qualified, severely disabled individuals exists for these jobs in the St. Louis area. To the contrary, ServiceSource is aggressively recruiting AID's incumbent personnel, none of whom meet the definition of severely disabled.

**Count I(c): The Committee Did Not Properly Evaluate ServiceSource's Capability**

70.    The Committee also cannot add the BOS Contract to the PL unless the Committee is certain that ServiceSource itself is capable of performing the work:

> The nonprofit agency (or agencies) desiring to furnish a commodity or service under the JWOD Program *must satisfy the Committee* as to the extent of the labor operations to be performed that it will have the capability to meet Government quality

> standards and delivery schedules by the time it assumes
> responsibility for supplying the Government.

41 C.F.R. § 51-2.4(a)(3) (emphasis added).  If concerns exist about whether ServiceSource can

perform the required services, the Committee must address and resolve those concerns before

adding the BOS Contract to the PL.

71.    The Committee has no rational basis on which to conclude that ServiceSource can

perform the wide range of complex services required under the BOS Contract.

72.    According to its website, ServiceSource performs no services in the state of

Missouri, where NGA-West is located.  ServiceSource does not have experience providing

many types of services required under the BOS Contract, including security services and

emergency preparedness services.  Instead, ServiceSource describes its AbilityOne contracts as

spanning administrative services, food services, laundry services, and landscaping services.

(*See* http://www.servicesource.org/contract-services/abilityone-contracts.)

73.    Further, in describing its AbilityOne contracts, ServiceSource refers repeatedly to

individuals with "disabilities" rather than to the "severely disabled." (*Id.*)  ServiceSource boasts

that its employees provide "high level secretarial work," which begs the question of whether a

person who can perform such work really meets the definition of severely disabled.  In

describing its AbilityOne contracts involving secure mail center management, ServiceSource

states:  "We manage more than 90 mail centers, employing nearly 240 people with disabilities

who process more than 140 million pieces of mail annually."  But if none of those individuals

has *a severe disability* as defined in the JWOD Act and its implementing regulation,

ServiceSource is abusing the program.  The Committee cannot presume that every disability

qualifies as a severe disability as defined in the JWOD Act. *See Systems Application & Tech.,*

*Inc. v. United States*, 107 Fed. Cl. 795, 807 (2012) ("It is of particular concern to the court that the individual at the Army whose responsibility it was to protect the Army's interests showed an inclination to accept creative applications of the term 'severely disabled,' and seemed more eager to promote AbilityOne in general and Skookum in particular than to address the serious misgivings being raised. In addition, some Committee members seemed hostile to statutory limitations on the term 'severely disabled,' ... and the terms 'disabled' and 'severely disabled' are used interchangeably throughout the record as if there were no distinction.").

74.    The Committee must require ServiceSource to demonstrate that it can perform the BOS Contract with severely disabled labor.

75.    The Committee did not properly assess whether ServiceSource has the capability to provide a majority severely disabled workforce that can perform these requirements, nor whether ServiceSource can "meet the Government quality standards and delivery schedules by the time it assumes responsibility for supplying the Government." 41 C.F.R. § 51-2.4(a)(3). The FAR expressly requires that the Committee "find an AbilityOne participating nonprofit agency capable of furnishing the supplies or services before the nonprofit agency can be designated as a mandatory source under the AbilityOne Program." FAR 9.107(a).

76.    The Committee failed to make a reasonable determination of ServiceSource's capability prior to adding the BOS Contract services to the PL.

### Count I(d): The Committee Did Not Properly Evaluate The Impact On AID Of Adding the Services To The PL

77.    The Committee failed to properly consider the adverse impact to AID as a result of adding the services required under the BOS Contract to the PL.  The JWOD regulations require the Committee to "give[] particular attention" to two factors: "(A) The possible impact on the contractor's total sales, including the sales of affiliated companies and parent

corporations [and] (B) Whether that contractor has been a continuous supplier to the Government of the specific commodity or service proposed for addition and is, therefore, more dependent on the income from such sales to the Government." 41 C.F.R. § 51-2.4(a)(4)(i)(A), (B). Both of these factors, if properly considered, should have resulted in a Committee decision *against* adding the services to the PL.

78.     The Committee will cause a severe, irreparable adverse impact to AID by adding the BOS Contract services to the PL.

79.     AID provided extensive economic data to the Committee demonstrating that AID depends heavily on the BOS Contract. AID demonstrated that the BOS Contract accounted for approximately ███% of AID's total revenues for FY13. Further, AID provided projections showing that the BOS Contract will account for approximately ███% of its total revenues in FY14.

80.     The Committee also must consider that AID has been a continuous supplier to NGA since 1999. 41 C.F.R. § 51-2.4(a)(4)(i)(B).

81.     AID provided data to the Committee establishing that AID has performed these services continuously since 1999. In 1999, NGA awarded Contract No. NMA 402-99-C-0011 to AID. In 2009, NGA awarded the current BOS Contract to AID pursuant to full and open competition. AID repeatedly demonstrated to the Committee that the BOS Contract is at the center of AID's business portfolio.

82.     AID further established for the Committee that AID has developed its valuable, cleared workforce over the course of the last fourteen years. The loss of the contractor

workforce will exacerbate the severe adverse impact on AID.  AID has invested considerable resources to recruit, hire, and retain the current cleared workforce.

83.    Moreover, AID advised the Committee that it relies on its track record of successful performance under the BOS Contract as a business development tool to help AID secure other U.S. Government contracts. The loss of the BOS Contract, accordingly, will have damaging collateral impacts as well.

84.    Despite the substantial information provided by AID, the Committee did not meaningfully consider the harm to AID, AID's employees, or AID's owners in its analysis. Instead, the Committee simply declared that: "The contractor refused to ███████████████ ███████████████████████████████████ Following its standard practice, without such information, the Committee was unable to determine whether the addition of the service to the PL would result in severe adverse impact or if the contractor was more dependent on the sales. . ." (79 Fed. Reg. 22103, Ex. 10.)

85.    ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████

86.    ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████

████████████████████████████████████████

87.     Further, ANCSA requires that federal entities (including the Committee) treat AID as "economically disadvantaged "for all purposes of federal law" *See* 41 U.S.C. § 1626(e). The Committee could not properly determine that AID, an "economically disadvantaged" contractor, can withstand the loss of the BOS Contract. This is particularly so because the Committee avoids adding contracts held by other socially and economically disadvantaged contractors to the PL.

88.     Further, the FAR provides that "Indian organizations and Indian-owned economic enterprises ***shall have the maximum practicable opportunity*** to participate in performing contracts awarded by Federal agencies." FAR 26.102 (emphasis added).

89.     The loss of the BOS Contract will result in a severe adverse impact to AID's employees as well. To comply with the JWOD Act, ServiceSource will have to terminate the AID employees if ServiceSource intends to comply with the law and staff the BOS Contract with severely disabled workers. None of the AID employees currently working on the BOS Contract meet the legal definition of severely disabled because they maintain normal, competitive employment. *See* 41 U.S.C. § 8501(5); 41 C.F.R. § 51-1.3 (definition of other severely disabled).

90.     Further, the addition of the BOS Contract services to the PL will work severe harm to the Iñupiat Eskimo shareholders of AID, most of whom subsist far below the federal poverty line.

91.     Notwithstanding the Congressional mandate to foster and support the ANCs, the Committee did not consider the particular adverse impacts to AID or the Iñupiat people as a result of adding the services to the PL.

92.     As a result of each of the foregoing errors, the Committee's determination that AID will suffer no adverse impact lacks support, violates the JWOD Act and its regulations, and is arbitrary, capricious, and unreasonable.

WHEREFORE, AID respectfully requests that the Court grant judgment in favor of AID on Count I of this Complaint and (a) declare that the Committee's addition of the BOS Contract services to the PL violates law and regulation and is arbitrary and capricious; (b) enjoin the Committee from adding the BOS Contract services to the PL; (c) enjoin NGA from awarding the BOS Contract services to ServiceSource; (d) set aside and rescind the addition of the BOS Contract services to the PL; and (e) provide such other relief as the Court deems just and appropriate.

## COUNT II
### NGA's Decision To Issue A Sole Source Solicitation And Award A Contract To ServiceSource Violates Law And Regulation And Is Otherwise Arbitrary, Capricious, And Unreasonable

93.     AID incorporates Paragraphs 1 through 92 of the Complaint by reference herein.

### Count II(a) NGA Has Arbitrarily And In Violation Of Federal Procurement Law Supported The Addition Of The BOS Contract Services To The PL

94.     The Committee apparently involved one or more participants from NGA in the assessment of ServiceSource's capability.  In this regard, FAR 9.107 required that NGA perform a capability survey focusing on ServicesSource's technical and production capabilities to furnish the BOS Contract services using a severely disabled workforce.

95.     NGA (through certain contracting personnel) has worked with the Committee to procure the previously competed BOS Contract services from ServiceSource on a sole source basis, despite ServiceSource's inexperience, lack of qualifications, lack of demonstrated

capability, lack of resources, and inability to use a severely disabled workforce for the execution of the required work.

96.    In so doing, NGA contracting personnel ignored the concerns of operational personnel.

97.    NGA has not properly determined that ServiceSource can perform the BOS Contract services using a workforce comprised primarily of severely disabled persons.

98.    Further, contrary to the actions exhibited here, the Committee's regulations do not permit the addition of any and all work to the PL. Rather, a service can only be added to the PL if it is suitable. 41 C.F.R. § 51-2.4. To be suitable, at least four criteria "must" be satisfied: (1) employment potential; (2) nonprofit agency qualifications; (3) nonprofit agency capability; and (4) lack of severe adverse impact on incumbent contractor.  *Id.*  ServiceSource cannot demonstrate that it is a capable source for the BOS Contract services.  To be capable, ServiceSource must demonstrate its ability to perform (lawfully, with the requisite severely disabled labor force) the Contract work at the Government's quality standards by the time that it assumes responsibility for supplying the Government.  *Id.*

99.    AID is directly prejudiced by NGA's unlawful, arbitrary, capricious and unreasonable actions in supporting the Committee's addition of the BOS Contract services to the PL, as well as by NGA support of the SourceAmerica and Committee decisions to solicit and award a contract to ServiceSource on a sole source basis.

100.   NGA also took no consideration of the harm that its actions will have on AID or the likely degradation of the BOS Contract services at NGA-West.

101.   Without a proper basis to include the BOS Contract services on the PL, the proposed NGA award to ServiceSource necessarily constitutes an improper sole source contract.

### Count II(a): NGA's Failure To Identify And Evaluate SourceAmerica's Patent Organizational Conflicts Of Interest Violates Law And Regulation And Is Otherwise Arbitrary, Capricious, And Unreasonable

102.   NGA personnel have expressed concerns about the performance of the BOS Contract services by the severely disabled.   Ultimately, however, NGA did not act in accordance with the convictions of its personnel.

103.   Instead, NGA relied extensively on SourceAmerica's assessment of ServiceSource's capability. NGA's reliance on information provided by SourceAmerica created an organizational conflict of interest ("OCI") due to SourceAmerica's substantial, direct financial interest in the NGA award of a sole source contract to ServiceSource.   Because SourceAmerica will financially benefit from NGA's award of a sole source contract to ServiceSource, SourceAmerica has little incentive to provide NGA with any information that tends to show inexperience or lack of capability on the part of ServiceSource. *See* U.S. Gov't Accountability Office, GAO-08-236, Federal Disability Assistance Stronger Federal Oversight Could Help Assure Multiple Programs' Accountability, 25, 27 (Jan. 2007) (noting that "[t]he Committee for Purchase's regulations create at least two problems for NIB and NISH: the potential for a conflict of interest resulting from a lack of organizational independence as well as disincentives to perform their monitoring duties effectively. Specifically, these regulations require that NIB and NISH, on behalf of the Committee for Purchase, monitor the compliance of JWOD nonprofit agencies, but, at the same time, represent them in their dealings with the Committee for Purchase. Moreover, the regulations also permit NIB and NISH to charge a fee based on JWOD nonprofit agencies' sales to the government. . . .").

104. Under a proper OCI evaluation, NGA would have identified and evaluated SourceAmerica's dual roles. The FAR requires contracting officers to identify and evaluate potential OCIs as early in the acquisition process as possible, and to avoid, neutralize or mitigate significant OCIs. FAR 9.504(a). The FAR also requires contracting officers to recommend a course of action for resolving any OCI so identified before issuing a solicitation for a contract. FAR 9.504(b). The contracting officer is required to formally document his or her judgment when there is "a substantive issue" concerning an OCI. FAR 9.504(d).

105. Contrary to these requirements, the Contracting Officer failed to identify and disclose the OCI. This failure prejudiced AID, which is now precluded from competing any further for these services.

WHEREFORE, AID respectfully requests that the Court grant judgment in favor of AID on Count II of its Complaint and (a) declare that NGA's actions in support of the addition of the services to the PL and in connection with the sole source solicitation and award to ServiceSource violate law and regulation and are otherwise arbitrary and capricious, (b) declare that NGA may not lawfully solicit or acquire the services from ServiceSource absent a proper competition in which ServiceSource prevails, and (c) declare that NGA may not acquire the services from ServiceSource absent a proper evaluation of all potential OCIs and a resolution of all actual significant OCIs, (d) issue injunctive relief preventing NGA from soliciting the services from, and awarding the services to, ServiceSource.

## PRAYER FOR RELIEF

WHEREFORE, AID prays that this Court:

A.      Issue the declaratory and injunctive relief set forth above;

B.      Award AID its fees and costs expended pursuant to the Equal Access to Justice Act, as appropriate;

C.      Provide such other and further relief as the Court deems just and proper.

Dated: May 5, 2014                              Respectfully submitted,

                                                ARNOLD & PORTER LLP

                                                *Craig Helman /dlc*

                                                Craig A. Holman
                                                Dominique L. Casimir
                                                555 Twelfth Street, N.W.
                                                Washington, D.C. 20004-1202
                                                Tel: (202) 942-5722
                                                Fax: (202) 942-5999
                                                *Attorneys for Plaintiff Akima Intra-Data, LLC*

39

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2014, I caused a true and correct copy of the foregoing

Complaint for Injunctive and Declaratory Relief to be served by hand delivery on:

Douglas G. Edelschick
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street N.W., Room 4056
Washington, D.C. 20005

Craig A. Holman