# In the United States Court of Federal Claims

No. 14-378C
(Filed:  December 23, 2014)*
**\*Opinion originally filed under seal on December 19, 2014**

| | | |
|---|---|---|
| AKIMA INTRA-DATA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Post-Award Bid Protest; Javits-Wagner-O'Day Act, 41 U.S.C. § 8501 et seq.; AbilityOne Program; Direct Labor Ratio; Alaska-Native-Owned Corporation |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SERVICESOURCE, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*Craig A. Holman*, Washington, DC, for plaintiff.  *Dominique L. Casimir*, Washington, DC, of counsel.

*Douglas G. Edelschick*, United States Department of Justice, Civil Division, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Steven J. Gillingham*, Assistant Director, for defendant.  *Dennis Lockard*,  Committee for Purchase from People Who are Blind or Severely Disabled, Arlington, VA, and *Mason C. Alinger*, National Geospatial-Intelligence Agency, Arnold, MO, of counsel.

*Robert J. Symon*, Washington, DC, for defendant-intervenor.  *William R. Purdy*, Jackson, MS, and *Aron C. Beezley*, Washington, DC, of counsel.

**O P I N I O N**

***Firestone***, Judge.

Pending before the court are the motion for judgment on the administrative record filed by plaintiff Akima Intra-Data, LLC ("AID"), ECF No. 32, and the cross-motions for judgment on the administrative record filed by defendant the United States ("the government") and defendant-intervenor ServiceSource, Inc. ("ServiceSource"), ECF Nos. 41 & 42. This case involves the award of the National Geospatial-Intelligence Agency ("NGA") West Base Operations Services ("BOS") contract. After a referral from NGA, the Committee for Purchase from People Who Are Blind or Severely Disabled ("CFP") awarded the contract to ServiceSource under the AbilityOne program created by the Javits-Wagner-O'Day Act ("the JWOD Act" or "the Act"), 41 U.S.C. §§ 8501-8506. Plaintiff, an Alaska-Native-Owned corporation ("ANC"), alleges that the award to ServiceSource, a nonprofit organization employing persons with severe disabilities ("PWSD"), was arbitrary, capricious, or a violation of the law for three principal reasons. First, plaintiff argues that CFP incorrectly determined that ServiceSource is "qualified" to receive a contract award under the AbilityOne program because CFP calculated the statutory ratio of direct labor performed by PWSD using all of the contract work performed by ServiceSource—both under AbilityOne and elsewhere—instead of focusing solely on the specific services to be provided under the BOS contract.[1] Plaintiff

---

[1] As discussed at length below, under the JWOD Act, a "qualified nonprofit agency" is defined, in relevant part, as a nonprofit agency

> that in the production of products and in the provision of services (whether or not the products or services are procured under this chapter) during the fiscal year employs blind or other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products or services.

argues that this was an incorrect calculation under definitions set forth in the JWOD Act.

Second, plaintiff argues that CFP erred in concluding that the BOS contract was suitable

to be added to the AbilityOne procurement list in the first instance.  As part of this

argument, plaintiff challenges CFP's findings for all four of the suitability factors set

forth by the regulations: (1) that the addition of the BOS contract would potentially create

employment for PWSD, (2) that ServiceSource was capable of performing the contract,

(3) that ServiceSource was eligible to perform the contract, and (4) that such an award

would not severely impact the incumbent plaintiff, AID.  Third, plaintiff argues that NGA

separately erred in relying on CFP's determinations by failing to perform its own

evaluation of ServiceSource's ability to perform the BOS contract and failing to

recognize that the organization that helped it to decide whether to refer the BOS contract

to the AbilityOne program, SourceAmerica, had an organizational conflict of interest in

the selection of ServiceSource due to the method by which it was funded.[2]

In response, the government and defendant-intervenor argue that the award to

ServiceSource through the AbilityOne program is lawful.  First, they argue that CFP's

interpretation of the JWOD Act with regard to a "qualified nonprofit agency" is based on

the plain language of the statute as well as its legislative history.  Next, they argue that

CFP's suitability determinations regarding the addition of the BOS contract to the

---

41 U.S.C. § 8501(6)(C).

[2] As discussed in detail below, SourceAmerica is not funded through appropriations but rather receives a percentage of the contract award from nonprofit agencies that secure AbilityOne work. 41 C.F.R. § 51-3.5.  Accordingly, plaintiff argues that NGA may not rely on any information supplied by SourceAmerica.

procurement list were rational and properly supported by the administrative record, therefore entitling them to deference.  Finally, they argue that plaintiff's arguments regarding NGA's role in the decision-making process are not relevant as the CFP decision is binding on NGA regardless of NGA's actions.  In the alternative, they argue that NGA's actions were proper in any event.

For the reasons set forth below, the court finds that the award to ServiceSource was lawful.  As a result, plaintiff's motion for judgment on the administrative record is **DENIED** and the government's and defendant-intervenor's cross-motions for judgment on the administrative record are **GRANTED**.

## I.     BACKGROUND

### A.      The AbilityOne Program

Under to the JWOD Act, Congress created CFP as a 15-member committee appointed by the President of the United States to administer the AbilityOne Program.  41 U.S.C. § 8502.  The AbilityOne program is intended to provide employment opportunities for blind and severely disabled persons whose condition is a barrier to traditional employment by qualified nonprofit agencies ("NPA").  The primary task of CFP is to "maintain and publish in the Federal Register a procurement list" that includes "products and services determined by the Committee to be suitable for the Federal Government to procure" from "a qualified [NPA] for the blind or . . . a qualified [NPA] for other severely disabled."  Id. at §§ 8502, 8503(a)(1); see also 41 C.F.R. §§ 51-2.2, 51-2.8.  In addition to adding suitable products and service to the procurement list, CFP is tasked to "determine the fair market price of products and services contained on the

procurement list that are offered for sale to the Federal Government by a qualified [NPA] for the blind or a qualified [NPA] for other severely disabled." 41 U.S.C. § 8503(b).

Once CFP adds a service to the procurement list, only qualified AbilityOne contractors are eligible to perform the work.  Id. at §§ 8501(6)-(7), 8503(a)(1).  The JWOD Act differentiates between NPAs that operate in the interest of the blind and those who operate in the interest of the severely disabled.  Qualified NPAs in both cases must employ "blind or other severely disabled individuals for at least 75 percent of the hours of direct labor[3] required for the production or provision of the products or services."  41 U.S.C. § 8501(6); see also 41 C.F.R. §§ 51-4.2, 51-4.3.  While exceptions may be made on a case-by-case basis, CFP policy "expects that the vast majority of individual AbilityOne Procurement List projects (fulfilling products or services) are performed with a direct labor ratio of at least 75 percent."  AR 3170-72.

Pursuant to the Act, CFP has designated two central NPAs to "facilitate the distribution, by direct allocation, subcontract, or any other means, of orders of the Federal Government for products and services on the procurement list among qualified [NPAs] for the blind or qualified [NPAs] for other severely disabled."  41 U.S.C. § 8503(c); see also 41 C.F.R. § 51-3.2.  These NPAs are SourceAmerica[4] and the National Industries for the Blind. 41 C.F.R. § 51-3.1.  Central NPAs do not receive appropriated funds; instead,

---

[3] "Direct labor" is defined as "all work required for preparation, processing, and packing of a product, or work directly relating to the performance of a service;" except "supervision, administration, inspection, or shipping." 41 U.S.C. § 8501(3); see also 41 C.F.R. § 51-1.3.

[4] SourceAmerica was formerly known as the National Industries for the Severely Handicapped. This name change occurred during the events at issue in this case.  For consistency, the court will refer to SourceAmerica throughout this opinion.

they fund their operations by charging fees to NPAs with Federal contracts.  41 C.F.R. §§ 51-3.5, 51-4.3(b)(9).  These central NPAs provide information about the AbilityOne program to federal agencies and assist them in selecting a potential NPA to perform the contract.  If a federal agency decides that it has a contract for products or services that might be suitable for the AbilityOne program, the central NPA refers the agency's contract to the CFP for consideration.[5]  CFP then determines whether the contract is suitable for inclusion on the AbilityOne procurement list and determines a fair price for the contract.  41 U.S.C. § 8503(b).  Finally, CFP publishes a notice in the Federal Register announcing the addition.  Id. at § 8503(a)(1).  CFP may reconsider such decisions independently upon receipt of relevant information or following a request by an interested party with 60 days of the effective date of the addition.  41 C.F.R. § 51-2.6.  Once the contract is included on the AbilityOne procurement list, it must be filled through the contractor identified by CFP unless and until CFP removes the product or service from the procurement list.[6]

### B.    The Procurement

Since 1999, NGA has contracted out for the performance of various services on its NGA Campus West ("NCW"), located in St. Louis, Missouri and later expanded to

---

[5] This submission is not a required step in the process, but rather assists CFP by helping to identify potential additions to the procurement list.  The federal agency could also refer the contract to CFP on its own, or CFP could independently consider the contract.

[6] CFP is required to monitor the contractor's performance to ensure that the contractor continues to meet the requirements for inclusion in the AbilityOne program.  41 C.F.R. § 51-2.2(d).

Arnold, Missouri.  These services, grouped together in the BOS contract Performance

Work Statement ("PWS"), include 11 different categories of work:

> (1) Classified Waste Disposal, Recycling, Fleet Management, Material
> Handling, and Warehouse Management; (2) Freight Management and Mail;
> (3) Property Inventory, Accountability, Management, and Disposition; (4)
> Janitorial; (5) Physician, Clinical Psychologist, Occupational Health Nurse,
> Optical, and Optometric; (6) Security; (7) Snow and Ice Removal, Grounds
> Maintenance, Roads and Grounds, Integrated Pest Management, and
> Refuse Collection; (8) Facilities Equipment Operations and Maintenance;
> (9) Project Management and Record Drawing Maintenance; (10) Customer
> Support, Conference Center, and Management Support; and (11) Safety and
> Emergency Preparedness.

AR 3151; see also AR 3186.  In order to perform these services, many contractor

personnel are required to have a Top Secret/Sensitive Compartmented Information

security clearance ("TS/SCI").  AR 2393, 3151, 3156.

Beginning in 1999, AID has performed the BOS contract for the St. Louis

location; since 2009, AID has performed the BOS for both of NGA's NCW locations.

AR 4269-70.  The original contract was awarded to AID under the Small Business

Administration's 8(a) program with a ten-year term.  Id.  That contract included a base

year and four option years, followed by five years as unpriced options for later

negotiation.  Id.  In 2002, NGA learned that AID was no longer eligible for the 8(a)

program and thus it could not continue to rely on the contract to provide work to AID.

Id.  Nonetheless, NGA was able to use the one responsible source exception to the full

and open competition requirement and AID continued to perform the contract during the

5 unpriced option years.  AR 4269-70, 4298-4302.

In December 2008, NGA conducted a full and open competition to select a contractor to perform a five-year BOS contract covering NGA's facilities in both NCW locations.  AR 4270-71.  In May 2009, NGA awarded the contract to AID, which was now required to compete as a large business due to its growth in the interim.  Id.  The contract contained one base year and four option years running through June 30, 2014.  Id.  As a result of this case, NGA has extended the contract with AID, the plaintiff, through December 31, 2014.  AR 7745-48.

In 2013, NGA began conducting market research in preparation for the competition that would follow the expiration of the BOS contract with AID in 2014.  AR 3486-92.  In March 2013, NGA issued a sources sought notice requesting information from prospective offerors interested in competing for the contract.  Id. at 3488, 3798-3802.  NGA received 28 responses from prospective offerors interested in performing the work, including an affiliate of AID, ServiceSource, and SourceAmerica.  AR 3488-90; 3803-04.  In May 2013, NGA issued a second notice, AR 4195-96, and received 11 responses.  AR 3490-91, 3722.

In May 2013, NGA personnel met with SourceAmerica representatives "to discuss the AbilityOne Program and how . . . [AbilityOne] contractors could fulfill the total NCW [BOS] requirements."  AR 3491.  During this meeting, SourceAmerica "representatives provided a detailed overview of how the program was started, what is the AbilityOne program, how [SourceAmerica] fits under the AbilityOne Program[,] and the process for awarding a contract under the" program.  Id.  Later that month, SourceAmerica representatives met NGA personnel "for a site visit of the St. Louis and

Arnold facilities and discussions/questions," including "a tour of the . . . main areas that are part of the BOS services." Id. at 3491-92. "The following day, discussions were held to address [NGA's] questions regarding . . . AbilityOne contractor capabilities" in providing "Total Facilities Management" services. Id.

Following these meetings and discussions, NGA's contracting officer ("CO") recommended in June 2013 that NGA "pursue AbilityOne as a potential source of services for the . . . [NCW] BOS requirement." AR 3492. Accordingly, SourceAmerica issued a sources sought notice to its pool of AbilityOne NPAs and solicited technical proposals for the NCW BOS contract. AR 5286-92. SourceAmerica received technical proposals from two interested nonprofit agencies, PRIDE Industries, AR 4864-5036, and ServiceSource, AR 5037-5257.

In June, both NGA and SourceAmerica independently evaluated the submitted proposals. On June 27, 2013, NGA eliminated PRIDE Industries from competition after determining that it did not address the "full scope of NGA's requirements." AR 5401-02. Regarding ServiceSource, NGA found that it (1) "[c]urrently holds a Top Secret (TS) Facility Clearance;" (2) "[e]xhibit[ed] [a] clear understanding of contract requirements and magnitude;" (3) "[d]emonstrated technical expertise and experience in Total Facilities Management (TFM);" (4)"addressed . . . how the contractor will specifically satisfy NGA requirements" for "[e]ach PWS Annex . . . in detail;" (5) has TFM experience "serving as BOS Prime Contractor at the [Department of Defense] Mark Center [Headquarters Complex, in Alexandria, Virginia,] which is comparable in size and scope [to that] of the NGA requirements;" and (6) presented a "[s]ound plan for

recruiting, hiring, and retaining personnel with TS/SCI clearances." Id.  Also on June 27,

SourceAmerica evaluated the submitted proposals and recommended ServiceSource as a

contractor to NGA.  AR 1218-67.

Through July and August 2013, NGA conducted on-site technical discussions with

ServiceSource and its proposed subcontractors regarding the PWS for the NCW BOS

contract.  AR 5261-62, 5363-64.  In September 2013, after multiple rounds of internal

briefings to NGA officials involved in the procurement decision-making process, the

NGA Deputy Director authorized the CO to pursue an acquisition strategy of proposing

that CFP add the BOS to the procurement list.  AR 4445, 4268-80.  In October 2013,

NGA posted a notice on FedBizOpps announcing the agency's intent to propose that the

CFP add the BOS to the AbilityOne procurement list.  AR 4317.

On October 16, 2013, NGA issued a formal request for proposal to ServiceSource

for the BOS.  AR 4746-4863.  On November 12, 2013, ServiceSource submitted its

technical and price proposals to NGA.  AR 5853-6619.  During the course of negotiations

in November and December, ServiceSource submitted additional price proposals.  AR

6814-7533.  On December 10, 2013, NGA and ServiceSource reached a tentative

agreement on the total, five-year price of the BOS contract: $71 million for the fixed-

price service components of the contract.  AR 7536-42.  After extensive discussions and

review, the NGA CO determined that ServiceSource was capable of performing the work.

AR 6724-28.

Under the proposal, ServiceSource would perform eight of the 11 categories of

services listed in the PWS.  AR 5937.  Among these services, ServiceSource identified 56

positions as suitable for performance by PWSD, including accounting clerks, service order dispatchers, and visitor control specialists.  AR 983.  ServiceSource also described types of severe disabilities that an individual might possess and still be capable of successfully performing a particular job function.  AR 983-86.  For example, ServiceSource described how a service order dispatcher position could be effectively performed by a PWSD with paralysis of the sciatic nerve in both legs such that the individual was unable to work for extended periods of time during the day.  AR 985.

For work at the prime contract level, ServiceSource proposed to perform 60 percent—approximately 34 positions—of the direct labor using PWSD, and proposed to reach that level through an 18-month phase-in period, partly to account for potential delays in the security clearance process.  AR 191.  By identifying several positions that did not require security clearances and were suitable for performance by PWSD, such as grounds maintenance, ServiceSource committed to begin performance with a 30 percent direct labor ratio.  AR 191.  ServiceSource also proposed to rely on escorts while a new hire's security investigation was ongoing, consistent with NGA's historical practice.  AR 2568.

For the remaining three categories of services, ServiceSource proposed to subcontract the work to two subcontractors.  For the janitorial services, ServiceSource proposed CW Resources ("CWR"), another NPA, as the subcontractor.  AR 1382.  As with ServiceSource, CWR proposed a 60% direct labor ratio with an 18-month phase-in period.  AR 1386, 2252.  For the physical and occupational health nurse services, ServiceSource proposed STGi International, a provider of occupational health services, as

11

the subcontractor.  AR 5937.  For the facilities equipment operations and maintenance services, ServiceSource proposed Exelis, a contractor with expertise in operations and maintenance, as the subcontractor.  Id.  These two subcontractors did not propose to use PWSD.

Shortly after reaching the tentative agreement on price with NGA, SourceAmerica submitted to CFP the proposal to add the NGA's BOS to the AbilityOne procurement list, including ServiceSources' proposed phase-in plans for hiring PWSD.  AR 171 et seq., 2232-53.  SourceAmerica's proposal on behalf of ServiceSource attached letters of support from various organizations in the St. Louis area that promote employment opportunities for wounded warriors and other persons with disabilities, including the severely disabled.  AR 2613-20.  ServiceSource also submitted its own detailed, 248-page technical proposal explaining how it planned to perform the services.  AR 730-977.

In February 2014, ServiceSource responded to questions from CFP about the suitability of adding NGA's BOS to the procurement list.  AR 3260-72, 3274-81.  In March 2014, CFP held a hearing to allow interested parties to make presentations regarding the proposed addition of the BOS contract to the procurement list.  AR 3337-84.  AID, ServiceSource, and NGA each made presentations to CFP about the proposed addition.  AR 3337-84, 7657.  Later in March, CFP members and staff toured the Department of Defense Mark Center in Alexandria, Virginia ("Mark Center"), which was identified as a facility where ServiceSource employs PWSD to perform services similar to those performed under the BOS contract.  AR 3303.  On April 1, 2014, CFP members and staff conducted a site visit at the NCW NGA facility to get a first-hand understanding

of those facilities and to see how the work compared to that performed at the Mark Center for purposes of determining whether there were barriers to employing PWSD.  AR 3303-09.

After this work was completed, the CFP prepared various assessments to assist CFP members regarding their vote to add or not add the BOS contract to the AbilityOne procurement list.  These assessments included: (1) a review of  NGA's work requirements, AR 3156-57; (2) SourceAmerica's recommendation of ServiceSource, AR 3209-11; (3) a review of the potential for the BOS contract to generate employment opportunities for PWSDs, AR 3212-18; (4)  an analysis of ServiceSource's capability to perform the BOS contract, AR 3219-23; (5) an analysis of ServiceSource's qualifications to participate in the AbilityOne program, AR 3226-27; (6) an analysis of the impact adding the NCW BOS contract would have on AID, AR 3228-29; (7) a legal review of the issues bearing on the suitability question, AR 3230-33; (8) a review of NGA's security clearance processes and procedures, AR 3301-02; (9)  a report on the first-hand observations garnered by CFP members and staff during the April 1, 2014  visit to NGA, AR 3303-09; (10) a review of ServiceSource's proposed phase-in plan for hiring PWSD, AR 3313-15; (11) a report on the fair market price for performance of the BOS services, AR 3385-86; and (12) the history of the AbilityOne program and employment of PWSD, AR 3450-52.  Individual recommendations were also prepared by CFP's Executive Director, AR 3401-04, and Deputy Executive Director, AR 3388-3400.

Voting by the CFP members began on April 3, 2014, and closed on April 14, 2014.  AR 3409; AR 7706.  The vote count revealed that the 15 CFP members had

unanimously agreed that NGA's BOS were suitable for addition to the AbilityOne procurement list and signed memoranda documenting their findings.  AR 3413-26, 3433-46.  On April 21, 2014, CFP published a notice in the Federal Register adding the BOS PWS to the AbilityOne procurement list, effective May 20, 2014.  AR 7551; Procurement List: Additions, 79 Fed. Reg. 22,103 (April 21, 2014).

To begin the transition to the new contractor, ServiceSource, NGA executed an initial 90-day contract modification to extend AID's incumbent contract through September 30, 2014.  AR 7692.  After this lawsuit was filed in May 2014, NGA rescinded the 90-day modification, see AR 7656, and instead executed a six-month extension of AID's current BOS contract through December 31, 2014.  AR 7745.  CFP also suspended the addition of services to the procurement list until November 20, 2014.  Procurement List: Additions and Deletions, 79 Fed. Reg. 28,489 (May 16, 2014) (suspending effective date until Nov. 20, 2014).

On June 9, 2014, the government sought a remand to CFP to consider certain issues identified in the litigation.  On June 10, 2014, the court granted the government's motion.  On remand, CFP sought additional information and responses to questions from ServiceSource with the goal of verifying ServiceSource's eligibility within the AbilityOne program.  To accomplish this, CFP sent a letter to ServiceSource with 21 separate questions and requests on June 17, 2014.  AR 8170.[7]  On June 20, 2014,

---

[7] Of particular relevance, CFP sought to clarify the accuracy of the statistics submitted by CFP demonstrating its direct labor ratio and to resolve perceived discrepancies between statements made by ServiceSource in the proposal and statements made in this case.  AR 8170-74.

14

ServiceSource responded to the inquiry and provided additional responses on July 3, 2014 and July 9, 2014.[8]  CWR, one of ServiceSource's subcontractors that is also a NPA, provided additional information to ServiceSource on July 2, 2014 and July 3, 2014, which was included in ServiceSource's response to CFP.  On July 7, 2014, the Executive Director of the CFP submitted the responses to the voting members, AR 8608, who unanimously voted to affirm their prior decision to add the BOS to the AbilityOne procurement list.  AR 8635.

Briefing on the cross-motions for judgment on the administrative record, including supplemented materials submitted to the CFP on remand, was completed on October 30, 2014 and was followed by an oral argument on November 13, 2014.

## II.    STANDARD OF REVIEW

The standard of review in bid protest cases is well-established.  The court will uphold an award decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  To prevail, the protester must demonstrate that either (1) the agency's decision was irrational, id. at 1351, or (2) the agency violated a regulation or procedure in a manner that significantly prejudiced the protester, Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009).

---

[8] Among other responses, ServiceSource affirmed the information that it had submitted in support of its proposal and offered explanations for the perceived discrepancies.  ServiceSource provided copies of the annual forms submitted to CFP including the direct labor ratio calculation, verified that it applied the statutory definition of "severely disabled," stated the difference between employees and labor hours, offered an explanation for the percentage of wages paid to PWSD, and claimed to maintain documentation for the PWSD that it employs.  AR 8176-8204

Where a protester seeks to demonstrate that the award decision was irrational, it must demonstrate that the agency's exercise of discretion lacked any "coherent and reasonable explanation." Banknote, 365 F.3d at 1351.  This standard is "highly deferential," Weeks Marine, 575 F.3d at 1368-69, and a plaintiff "bears a heavy burden of showing that the award decision had no rational basis," Banknote, 365 F.3d at 1351.  Where a rational basis exists, the court shall not substitute its judgment for that of the agency, "even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989).

Where, as here, a question of an agency's interpretation of a Federal statute is also at issue, the court will apply a two-step analysis.  First, the court will determine "whether Congress has directly spoken to the precise question at issue."  Corus Staal BV v. United States, 395 F.3d 1343, 1346 (Fed. Cir. 2005) (quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)).  If the court finds, based on the plain language of the statute, that "the intent of Congress is clear, that is the end of the matter."  Id.  However, if the court finds that the statute is silent or ambiguous with respect to the specific issue, the court will proceed to the second step: determining "whether the agency's answer is based on a permissible construction of the statute."  Id. (quoting Chevron, 467 U.S. at 843).  In determining whether the agency's interpretation is permissible, the court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute."  Suramerica de

Aleaciones Laminades, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).  The

agency's "interpretation governs in the absence of unambiguous statutory language to the

contrary or unreasonable resolution of language that is ambiguous."  United States v.

Eurodif S.A., 555 U.S. 305, 316 (2009); accord Timken Co. v. United States, 354 F.3d

1334, 1342 (Fed. Cir. 2004) ("[a]ny reasonable construction of the statute is a permissible

construction").

## III.   DISCUSSION

As discussed above, plaintiff contends that both CFP and NGA erred in deciding

to add the BOS for NGA's NCW to the AbilityOne procurement list and in selecting

ServiceSource to perform the work.  In response, the government and intervenor argue

that CFP's decision was lawful and rational and thus must be affirmed.  The court will

consider each of plaintiff's arguments in turn.

### A.   The Direct Labor Ratio for Determining the Qualification of an AbilityOne Contractor is Lawfully Calculated at the Agency Level.

The chief legal argument in this case concerns whether CFP erred when it decided

that ServiceSource was "qualified" for AbilityOne work according to the definition of a

NPA set forth in the JWOD Act, which requires an NPA to maintain a direct labor ratio

in which PWSD perform 75% of the direct labor during a given fiscal year.  Specifically,

plaintiff argues that CFP is required to calculate this 75% requirement using only the

specific type of service that is listed on the procurement list.[9]  Plaintiff argues that

---

[9] For example, if CFP were to add "janitorial services" to the procurement list, a NPA seeking to
be assigned by CFP to perform those services must maintain a 75% direct labor ratio for all
"janitorial services" that it performs, regardless of what direct labor ratio it maintains for any

because ServiceSource has a phase-in plan that only requires it to reach 60% direct labor

ratio for the BOS work after 18 months, it was not "qualified" under the JWOD Act and

cannot do the work as a matter of law.  The government and intervenor argue that

plaintiff's reading of the JWOD Act is contrary to the plain language of the statute and

that CFP's reading of the statute is correct.  The government and intervenor contend that

the statute requires that the calculation of the direct labor ratio includes ServiceSource's

agency-wide work hours—under all of its various contracts—to determine whether it

meets the 75% ratio and is therefore "qualified" to participate in the AbilityOne Program

as a whole.

　　　As noted above, under the JWOD Act, a "qualified nonprofit agency" for PWSD

is defined, in relevant part, as an agency

> that in the production of products and in the provision of services (whether
> or not the products or services are procured under this chapter) during the
> fiscal year employs blind or other severely disabled individuals for at least
> 75 percent of the hours of direct labor required for the production or
> provision of the products or services.

41 U.S.C. § 8501(6)(C).  Plaintiff argues that this language requires 75% of the direct

labor hours for each procurement list service performed by the agency be performed by

PWSD.  According to plaintiff, the use of the term "the . . . services," in the last sentence

of the provision, demonstrates that the 75% labor ratio applies to the "provision" of all of

the services provided by the nonprofit and thus compliance with § 8501(6)(C) is

measured by calculating the ratio of direct labor by PWSD on each separate services

---

other services it provides or products it produces.  Under this standard, ServiceSource may be
eligible to perform certain contracts but not others.

procurement contract.  Thus, plaintiff argues, CFP cannot apply the ratio to all of the work provided by the agency, but instead is limited to considering the particular service that is to be provided.  In this case, as ServiceSource was not previously performed by ServiceSource, it would be required to demonstrate that it could immediately achieve a 75% direct labor ratio for BOS and could not rely on a phase-in plan.  In support of its interpretation of the JWOD Act, plaintiff refers to CFP's notice in the Federal Register, in which it identified "the services" as the BOS to be performed at NGA's NCW.  Plaintiff further argues that Congress elected not to use the words "all" or "agency-wide" in the statute, thus making clear that the 75% ratio calculation was not to be done at the agency level.  Plaintiff contends that the more expansive interpretation offered by the government and defendant-intervenor would permit manipulation of the ratio through misclassification and subcontracting, thereby creating a loophole allowing for the performance of large contracts by non-disabled employees on any individual AbilityOne procurement in contravention of Congressional intent.

In response, the government and defendant-intervenor argue that the plain language of the statute requires CFP to calculate the 75% labor ratio based on all of the NPA's work at the agency-level.  Specifically, the government and intervenor contend that the parenthetical in § 8501(6)(C) states that "whether or not the . . . services are procured under [the AbilityOne program]" compels a finding in favor of their interpretation of the statute.  According to the government and intervenor, a calculation that by law can include services not procured under the AbilityOne program to determine whether an agency is qualified must, by definition, be broader than plaintiff argues.  They

read "whether or not the . . . services are procured under the [AbilityOne] program" to mean that Congress wanted to qualify non-profit agencies that could show, taking into account all of their work hours, that they satisfied the 75% requirement. Under the government and intervenor's reading of the Act, ServiceSource was required to demonstrate—and CFP required to find—that for any fiscal year it met the 75% ratio taking into account all of the products it produced and services it provided, including the BOS performed pursuant to the contract at issue here.

The court agrees with the government and intervenor's reading of § 8501(6)(C) of the JWOD Act. When interpreting a statute, the court looks first to the language of the statute to determine whether the meaning is unambiguous. As noted above, if the meaning is plain, the court need look no further. Here, the court finds that the statute unambiguously provides for a calculation of the 75% direct labor ratio based on all of the nonprofit agency's work. The court finds that the term "the . . . services" used at the end of § 8501(6)(C) refers to the same "services" used at the beginning of the clause, which plainly includes plural "services" performed both pursuant to and separately from the AbilityOne program. Congress's inclusion of "services" under both AbilityOne and non-AbilityOne contracts with respect to establishing a ratio only has meaning if the calculation is to be performed based on all of the work hours performed by PWSD on an agency-wide level. Plaintiff's reading of the statute effectively reads a NPA's non-AbilityOne work out of this equation. The court will not interpret the statute to make the parenthetical in § 8501(6)(C) mere surplusage. See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 237 (2008) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)). Plaintiff's

argument that Congress intended to impose a 75% ratio requirement for each separate

AbilityOne service listed simply cannot be reconciled with the plain language of the

statute and is thus rejected.[10]

Having determined that the statute is unambiguous, the court need proceed no

further.  Nevertheless, for the sake of completeness, the court shall consider plaintiff's

additional arguments regarding the 75% ratio.  The court finds from its review of the

legislative history of the JWOD Act that this history supports the government's reading

of the Act.  Plaintiff argues that the JWOD Act was amended in 1971 and 1974 to correct

CFP's regulations, which authorized the calculation of direct labor across all of the

nonprofit agency's work, and to instead require CFP to apply the ratio to each service

provided.  Plaintiff argues that Congress was specifically responding to the decision in

Ballerina Pen Co. v. Kunzig, 433 F.2d 1204 (D.C. Cir. 1970), which dealt with a contract

that provided only a small percentage of direct labor by PWSD.  Specifically, plaintiff

argues that, while Congress adopted much of the language from the CFP's 1969

regulations allowing for an agency-wide ratio calculation in the 1971 amendment to the

statute, it specifically rejected CFP's ratio formulation and purposefully omitted the

phrase "all articles" in order to limit the calculation to a per-product or  per-service basis.

In support, plaintiff relies on testimony by John F. Nagle, an officer for the National

Federation of the Blind, who argued that the Act should be amended to require a per-

---

[10] Even if the language of the statute were not clear, there is an absence of unambiguous
language contrary to the agency's interpretation.  See Eurodif S.A., 555 U.S. at 316.  As a result,
the court would be required to defer to CFP's interpretation of the statutory requirement.

product or per-service calculation, to show that Congress was concerned about the potential misuse of the AbilityOne program to benefit those without disabilities. Regarding the 1974 amendment, plaintiff argues that specific statements in the House and Senate reports reflect Congress's intent to impose a per-service requirement in calculating the ratio, although the statutory language at issue in this case was not amended in that year.

In response, the government and intervenor argue that plaintiff has misread the import of the 1971 amendments to the JWOD. According to them, Congress amended the Act in 1971 in order to affirm Congressional support for the 75% agency-wide calculation after questions about statutory authorization for CFP's interpretation were raised in Ballerina Pen. They argue that a review of the 1971 amendments demonstrates that the amended language is nearly identical to the 1969 CFP regulations, which, in turn, shows that Congress intended to maintain the agency-level calculation. The government and intervenor also argue that the testimony of one private citizen does not alter this showing of Congressional intent. As to the 1974 amendment, they argue that plaintiff's argument is misplaced because Congress did not amend the provisions at issue and thus did not alter the meaning set by the 1971 amendments.

As stated above, the court agrees with the government and intervenor's reading of the legislative history. While the language adopted by Congress in 1971 with regard to the 75% ratio is not identical to CFP's 1969 regulations, the changes made to CFP's language by Congress in the relevant provision did not change the substantive meaning of

CFP's regulation and its use of an agency-wide approach.  The 1969 regulations stated

with regard to qualified nonprofit agencies:

> which employs blind persons to an extent constituting not less than 75
> percent of the total hours of employment during the fiscal year, of all
> personnel engaged in the direct labor of manufacturing, assembling, or
> handling of all commodities by the agency for the blind (hereinafter
> referred to as "workshop") whether for this program or otherwise.

41 C.F.R. § 51-1.1(b) (1969).  The 1971 amendment included the statutory definition:

> which in the production of commodities and in the provision of services
> (whether or not the commodities or services are procured under this Act)
> during the fiscal year employs blind individuals for not less than 75 per
> centum of the man-hours of direct labor required for the production or
> provision of the commodities or services.

41 U.S.C. § 8501(6)(C) (1971).  The statutory language change does not, as plaintiff

argues, evidence an intent by Congress to reverse the meaning of the 1969 regulations.

In 1969, CFP used the inclusive "all commodities" to indicate an agency-level calculation

"whether for this program or otherwise."  In 1971, Congress used the plural

"commodities or services" and clarified that the ratio is based on all "commodities or

services" provided by the agency regardless of whether they were "procured under this

Act."  The result of these approaches is the same: the analysis includes all products

produced under the AbilityOne program and otherwise.[11]  Thus, an analysis of the two

clauses in both the CFP regulation and the 1971 amendment demonstrates the correctness

---

[11] The 1971 amendments also introduced services to the AbilityOne program.

of the government's reading and does not show an intent by Congress to reverse CFP's approach to determining the 75% ratio.[12]

Regarding the specific effect of Ballerina Pen on Congress's action, the court is not persuaded by plaintiff's argument.  First, while the court in that case stated that "[t]he sole question before us today is whether appellants have standing to challenge the actions of the Committee and the General Services Administration," it did go on to discuss other elements of the case.  Ballerina Pen, 433 F.2d at 1206.  In these comments, the court did not criticize CFP's regulations.  The court noted that the direct labor requirement "does not mean, and was not intended to mean, that blind persons must perform 75% [o]f the direct labor on each and every particular product produced by the workshops" and went on to add that "neither the [JWOD] Act nor the regulations specify exactly what percentage of the contract must represent blind labor."  Id. at 1212.  While the court noted that it had been alleged that only 14% of the labor for producing the pens at issue was done by blind labor, it did not offer an opinion on whether such a ratio would violate the JWOD Act.  See id.

Further, nothing in the 1974 JWOD amendments alters the court's conclusion that Congress did not intend to change CFP's approach to the 75% requirement.  In 1974, Congress made several additional amendments to the JWOD Act.  While most of these

---

[12] Plaintiff also argues that CFP's post-1971 revision of the CFP regulations provides further evidence that the pre-amendment regulations were incompatible with the amendment.  However, the 1971 amendments made major changes to the AbilityOne program unrelated to the direct labor ratio calculation, as well.  Thus, the fact that an overhaul of the regulations was required has no bearing on whether Congress had overruled CFP's prior regulations with regard to that individual aspect.

amendments were minor and unrelated to the issue in this case, Congress added the

definition of direct labor now codified at 41 U.S.C. § 8501(3).  This definition specified

that direct labor "includes all work required for preparation, processing, and packing of a

product, or work directly relating to the performance of a service; but does not include

supervision, administration, inspection, or shipping."  Pub. L. 93-359, 88 Stat. 392

(1974).  While plaintiff argues that this amendment and other statements made as part of

the Senate report indicate that Congress interpreted the requirement to ensure that the

75% ratio be met on a per-service level and intended the 1974 amendments to clarify this

meaning, the court agrees with the government that the amendments did not change the

language regarding the ratio calculation.  Direct labor is an element of the ratio

calculation in that it is what the ratio measured, but the specific definition of direct labor

has no bearing on whether the calculation to determine the ratio is done at the agency-

wide or specific-service level.[13]

     The court has also considered and rejects plaintiff's contention that its reading of

the Act should be adopted as the reading most consistent with CFP's historic application

of the 75% ratio.  Plaintiff argues that, following the 1971 amendments and until

recently, CFP had demanded that the 75% ratio be applied to each individual AbilityOne

project.  In support, plaintiff contrasts the June 29, 2007 Committee Staff Nonprofit

---

[13] Plaintiff also argues that statements made by committee members as part of the enactment of
the 1974 amendments provide evidence into the intent behind the 1971 amendments.  However,
while these members may have been involved in the earlier passage of the 1971 amendments,
"[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of
statutory interpretation."  Bruesewitz v. Wyeth LLC, 562 U.S. 223, ---, 131 S.Ct. 1068, 1082
(2011) (citing Jones v. United States, 526 U.S. 227, 238 (1999); United States v. Mine Workers,
330 U.S. 258, 281-282 (1947).

Agency Review Manual ("Manual") with later statements of Executive Committee member Lou Bartalot ("Mr. Bartalot").  With regard to an agency's overall ratio, the CFP Manual states that "[i]t is always important to emphasize the imperative of meeting the 75% direct labor ratio, and that it applies to the total work being done by the nonprofit agency."  AR 8419.  With regard to AbilityOne projects themselves, the Manual states the "[CFP] policy directs that at least 75% of the direct labor hours performed on the aggregate of AbilityOne work should be done by people who are blind or severely disabled.  However, the ratio on individual AbilityOne projects must be no lower than 60%. . . .  This policy is not as inflexible as the 75% overall direct labor ratio requirement."  Id.[14]  Plaintiff contrasts this with statements made during a CFP meeting on April 24, 2012.  First, plaintiff refers to the following exchange:

> Tina Ballard: What I was asking is on the projects are we required to have 75% of the people have significant disabilities and I understood the answer to be no.
>
> Jim Omvig: That's right.
>
> Tina Ballard: So, if he does not have to have 75% on the project, then on that project can he do the jobs on the range without hiring any people with significant disabilities and maintain his overall 75% ratio.
>
> Lou Bartalot: Well!
>
> Jim Omvig: So, we understood right.

---

[14] Plaintiff argues that these statements are internally inconsistent, but that they nevertheless have the net effect of requiring a 75% per-service requirement.  As the sections address overall and individual project requirements as separate calculations, the court finds them to be internally consistent and in accordance with the statutory language regarding the 75% ratio in determining whether an agency is "qualified."

> Lou Bartalot: The answer is technically yes, but we don't require and we don't allow anybody to have a project added to the Procurement List that isn't going to provide jobs to people who are blind or severely disabled.
>
> Tina Ballard: But, technically the answer is yes. We still drive them to accomplish the mission of the Program on every project, is the answer.
>
> Lou Bartalot: Well, I disagree the answer is technically yes . . . .
>
> Tina Ballard: You just said it was.
>
> Lou Bartalot: No, if you simply read the regs, yes.  But, we don't allow anybody to do that.  So technically, they can't do it because we wouldn't allow them to do it.

AR 2530-31.  Second, plaintiff refers to Mr. Bartalot's statement that

> I think in part yes, I mean we have a history, I did look.  At least back as far as 1982, I can find records where [CFP] had a policy that you needed a phase-in plan if you started at less than 50%, and back in 1982 the assumption was that every project would get to 75%.  So, even back then we were allowing projects that started below that 50%.

AR 2532.  Plaintiff argues that these materials, read together, demonstrate both that CFP has historically required that 75% of direct labor for each AbilityOne project be performed by PWSD and that it has now changed its interpretation to reflect the agency-wide level approach it used in this case.

In response, the government argues that CFP has consistently applied the 75% requirement for determining whether an agency is qualified.  The government notes that a review of CFP guidance demonstrates that Congress has set a strict 75% agency-level requirement for determining whether an agency is "qualified," and CFP has set an aspirational 75% per-service project objective, with a 60% regulatory requirement.  The government contends that, as the statute does not set or forbid establishing a labor ratio

for services listed on the AbilityOne list, CFP is free to set and enforce its own

requirement, presumably by removing a service from the procurement list if the nonprofit

agency fails to achieve the desired number of hours for PWSD following a phase-in

period.

The court agrees with the government and finds no inconsistency in CFP's policies

over the relevant period.  CFP has always required that agencies meet a 75% ratio at the

agency level to be "qualified."  It is clear to the court that the statements by Mr. Bartalot

relied on by plaintiff do not address the 75% "qualification" requirement for nonprofit

agencies, but rather the suitability requirement of providing employment for PWSD.  The

second comment addresses the history of CFP's phase-in procedures, which at best only

indirectly affect a nonprofit's eligibility as a qualified nonprofit based on the agency's

agency-level ratio.  The first comment addresses the hypothetical possibility that an

agency could be awarded an AbilityOne work while proposing to hire no PWSD, so long

as it did not cause the NPA's agency-level ratio to fall below 75%.  A hypothetical

concern does not allow the court to turn the "qualification" requirement for any

individual NPA into a substantive requirement for each individual AbilityOne project.

Indeed, Mr. Bartalot acknowledged that CFP would not make such an award to a NPA

that did not intend to hire any PWSD because the project would fail to provide potential

employment to PWSD and therefore would not be "suitable" for addition to the

procurement list under other regulatory requirements.  This is consistent with the court's

understanding of the interplay between the various elements of the regulatory suitability

requirements, and is in accordance with the court's interpretation of the statutory

eligibility or qualification requirements for NPAs seeking work under the AbilityOne program.

Next, the court rejects plaintiff's contention that its reading of the statutory 75% requirement as applying on an agency-wide basis is inconsistent with all other courts to consider this issue. Plaintiff argues that the United States Court of Appeals for the District of Columbia rejected CFP's use of an agency-level approach to meeting the 75% ratio in McGregor Printing Corp. v. Kemp, 20 F.3d 1188 (D.C. Cir. 1994). According to plaintiff, the court in that case was dismissive of the ratio argument, finding that CFP's own regulation focused on the generation of employment opportunities for each product added to the procurement list. Plaintiff also cited HLI Lordship Industries, Inc. v. Commission For Purchase from the Blind and Other Severely Handicapped, 791 F.2d 1136 (4th Cir. 1986), arguing that it demonstrated a similar rejection of CFP's approach here. In response, the government argues that neither court actually addressed the ratio calculation, but dealt instead with other suitability issues. As a result, the government argues that no court that has considered the issue has found that an eligibility or qualification determination for a nonprofit agency based on an agency-level calculation to be incorrect.

The court has reviewed the cases identified by plaintiff and agrees with the government that none have addressed the question of whether CFP may use an agency-level calculation to determine eligibility. In McGregor, it is clear that the court was addressing the related—but distinct—questions of whether the nonprofit agency had the capability to produce the product in question and whether adding the product to the

procurement list would create employment opportunities for PWSD.  McGregor, 20 F.3d

at 1195. The court found that CFP's suitability analysis in that case was lacking because

"[t]here is nothing in the record to support [CFP's] apparent conclusion that blind people

could do the work . . . described" and that CFP "never analyzed the . . . production

process or the experience of [the NPA] in producing similar products." Id.  The phrase

"focuses on the employment opportunities" in the decision makes it clear that the parties

were not disagreeing over whether the subject NPA was eligible or "qualified" to perform

the work—instead, the focus of the court was on other prongs of the suitability analysis

involved in adding the product to the procurement list.  Id.  As a result, the court finds

plaintiff's reliance on McGregor regarding CFP's ratio calculation to be misplaced.

Similarly, in HLI Lordship, the court did not reach the question of the direct labor

ratio calculation, but rather overturned CFP's addition to the procurement list based on

CFP's failure to provide a sufficient explanation of its reasoning.  HLI Lordship, 791

F.2d at 1141.  While noting that CFP was not required to provide an exhaustive

explanation, the court found that CFP provided virtually no explanation for its decision.

Id. (quoting State of S.C. ex. rel. Tindal v. Block, 717 F.2d 874, 886 (4th Cir. 1983)).

There is no dispute in this case that CFP documented its decision and provided specific

reasoning.

Finally, the court also rejects plaintiff's policy argument that without imposing a

75% ratio for each AbilityOne service listed, the AbilityOne program can be used as a

subterfuge for keeping contracts out of the competitive process and providing work to

persons without disabilities.  According to plaintiff, because services listed on the

AbilityOne procurement list must be performed by a NPA set by CFP and will not be competitively bid, federal agencies may turn to the AbilityOne program knowing that much of the work can be performed by persons without PWSD through manipulation of the direct labor ratio and subcontracting.  Plaintiff argues that Congress has identified these policy issues as a problem and that the statute must be interpreted to make sure that the purposes of the AbilityOne program—namely, to benefit the blind and PWSD—are being met.

The court agrees that the plaintiff has identified legitimate policy concerns.[15] However, contrary to plaintiff's assertions, the court finds that these policy concerns do not compel plaintiff's reading of the statute, but rather raise concerns that may be addressed by Congress in the future.  Moreover, as the government argues, these policy concerns are effectively addressed in the Act and by CFP in other ways.  First, CFP is required to perform periodic compliance checks of the nonprofits to ensure that they are meeting the ratio and other statutory requirements, 41 C.F.R. § 51-2.2(d), and CFP can change their award or remove an item from the procurement list if it finds that an agency is not acting in accordance with statutory and regulatory requirements, 41 U.S.C § 8503(a)(2).  Second, and perhaps more importantly, CFP may only add a project to the AbilityOne procurement list if it finds that the project will provide legitimate employment opportunities for PWSD.  41 C.F.R. § 51-2.4(a)(1).  Such a finding may be

---

[15] Plaintiff has provided materials from investigations by the Government Accountability Office and law review articles indicating concerns about the AbilityOne program generally.  The conclusions contained in these materials, which are unrelated to this case, are undisputed here.

challenged at two stages: following the addition of the services to the Federal Register and, as here, in court with a bid protest.  As a result, CFP cannot lawfully use the AbilityOne procurement list as a means of aiding federal agencies seeking merely to avoid competition.  As discussed in greater detail below, CFP—in this case and in others—is required to justify its decision regarding opportunities for PWSD.  See, e.g., HLI Lordship, 791 F.2d at 1141 (finding that CFP did not adequately justify its decision). If a project will not provide such opportunities it will either not be added to the list or if successfully challenged the work will be removed from the AbilityOne procurement list.

In sum, for all of the above-stated reasons, the court finds that CFP's reliance on all of ServiceSource's agency-wide work to find that they were "qualified" and thus eligible to participate in the AbilityOne program was consistent with the statute and was not in violation of the law or any CFP regulation.[16]

**B.     CFP Rationally Determined That the Contract Is Suitable for Addition to the Procurement List.**

Plaintiff next challenges CFP's suitability determination, which found that the BOS could be added to the procurement list.  Under the committee's regulations,

> For a commodity or service to be suitable for addition to the Procurement List, each of the following criteria must be satisfied:

---

[16] While the court has determined that CFP's conclusion that the 75% ratio is met by looking at all of the agency's work is compelled by the plain language of the JWOD Act, the court further finds that, even if the statute were ambiguous, CFP has reasonably interpreted the subject statute regarding the 75% ratio and thus its interpretation is entitled to deference for the reasons set forth above.  Timken Co. v. United States, 354 F.3d at 1342 ("[a]ny reasonable construction of the statute is a permissible construction").

(1) Employment potential.  The proposed addition must demonstrate a potential to generate employment for persons who are blind or have other severe disabilities.

(2) Nonprofit agency qualifications.  The nonprofit agency (or agencies) proposing to furnish the item must qualify as a nonprofit agency serving persons who are blind or have other severe disabilities, as set forth in part 51-4 of this chapter.

(3) Capability.  The nonprofit agency (or agencies) desiring to furnish a commodity or service under the JWOD Program must satisfy the Committee as to the extent of the labor operations to be performed and that it will have the capability to meet Government quality standards and delivery schedules by the time it assumes responsibility for supplying the Government.

(4) Level of impact on the current contractor for the commodity or service.

    i.   In deciding whether or not a proposed addition to the Procurement List is likely to have a severe adverse impact on the current contractor for the specific commodity or service, the Committee gives particular attention to:

        A.  The possible impact on the contractor's total sales, including the sales of affiliated companies and parent corporations.  In addition, the Committee considers the effects of previous Committee actions.

        B.  Whether that contractor has been a continuous supplier to the Government of the specific commodity or service proposed for addition and is, therefore, more dependent on the income from such sales to the Government.

    ii.  If there is not a current contract for the commodity or service being proposed for addition to the Procurement List, the Committee may consider the most recent contractor to furnish the item to the Government as the current contractor for the purpose of determining the level of impact.

41 C.F.R. § 51-2.4(a).  Plaintiff challenges CFP's determination of all four of these

elements: (1) the potential for the BOS contract to generate employment for PWSD, (2)

ServiceSource's capability to perform the BOS contract, (3) ServiceSource's eligibility to be an AbilityOne NPA, and (4) the impact on AID.  In response, the government argues that CFP's determinations were rational based on the record.  Each of these issues is discussed, in turn, below.

> **i.      CFP Rationally Found that the BOS Contract Had the Potential to Generate Employment for PWSD.**

First, plaintiff argues that the record does not support a determination that adding the BOS to the procurement list will generate additional employment for PWSD. According to plaintiff, the record does not identify any qualified and unemployed PWSD with a TS/SCI clearance or the ability to obtain one living in the vicinity of the NCW. Further, plaintiff argues that the extended phase-in period is contrary to law.  Plaintiff relies on Systems Application & Technology, Inc. v. United States, 107 Fed. Cl. 795 (2012), for the proposition that the burden is on the NPA to demonstrate that there are sufficient jobs that may be performed by PWSD, and that a promise to reach 60% PWSD labor within three years is not sufficient to satisfy the regulatory standard.  Relying on the total numbers of contract positions, AID argues that ServiceSource will only be able to fill one-third of the contract positions with PWSD.  Of those positions, plaintiff argues that the potential workers discussed in the proposal do not all fit the statutory definition of a PWSD.  Additionally, plaintiff argues that CFP lacked sufficient information to determine that there were sufficient PWSD in the St. Louis area, that PWSD could perform the work at issue, and that PWSD could obtain the TS/SCI clearance required to perform some of the positions.

In response, the government argues that CFP was not required to find that employment was guaranteed for PWSD, but rather merely must find that there was a demonstrated potential to generate employment.  According to the government, CFP rationally determined that such a potential existed and supported this finding with record evidence.  The government notes that CFP found that the proposed contract would provide employment for between 47 and 51 PWSD, that ServiceSource has relevant experience in hiring PWSD, and that ServiceSource has a hiring plan well-suited to this project.  The government argues that CFP found that ServiceSource has created a team of human resources specialists to assist in staffing its contract locations, and that ServiceSource's track record demonstrates that ServiceSource has had success using this approach in the past under previous contracts.  The government further contends that CFP found that ServiceSource's hiring plan identified a variety of state and local vocational rehabilitation agencies, other NPAs, and veteran organizations with which to create a referral network.  Regarding the allegation that only one-third of the positions will be filled with PWSD, the government argues that plaintiff's argument conflates the total number of contract positions—which is not part of any calculation—with the total number of direct labor hours that will be performed—which is used to determine the ratio discussed above.  Regarding the phase-in plan, the government argues that CFP policy authorizes phase-in plans, as well as the subcontracting of work to other NPAs, and that CFP found that the phase-in plan would not cause ServiceSource to fall below the 75% direct labor requirement for the fiscal year.  Regarding security clearances, the government argues that CFP found that physical disabilities are not considered when

obtaining TS/SCI clearance and that mental disabilities are not a bar to obtaining such a clearance.  Additionally, the government argues that services similar to the BOS have been performed under the AbilityOne program before, including multiple ServiceSource contracts.  Finally, the government argues that plaintiff's reliance on <u>Systems Application</u> is misplaced, because <u>Systems Application</u> is factually distinguishable from the present case.

The court finds that CFP's determination regarding the potential to generate employment for PWSD was rational and therefore must be upheld.  The regulations governing the addition of services to the procurement list state that "[t]he proposed addition must demonstrate a potential to generate employment for persons who are blind or have other severe disabilities."  41 C.F.R. § 51-2.4(a)(1).  This language clearly requires only that CFP determine the "potential" to generate employment rather than a guarantee of employment.  <u>Id.</u>  Based on the record, it is clear that CFP considered a significant amount of evidence in making its determination regarding the potential of the BOS work to generate opportunities for PWSD.  This evidence, as discussed below, included demographic information about the surrounding area, letters from state and local organizations that had offered to assist ServiceSource in locating qualified PWSD, and a specific hiring plan.  Accordingly, CFP properly relied on historical information and ServiceSource's proposed plans in making its determination.

Further, it is clear that CFP appropriately differentiated between the total positions created for PWSD and the direct labor hours that would be performed by PWSD. The contract identifies a total staff of 153.66, of which ServiceSource has identified 56

positions that may be performed by PWSD.  Plaintiff argues that, using these figures, it is

impossible for ServiceSource to reach the 75% statutory requirement even under the

CFP's reading of the Act.[17]

The government argues that plaintiff is conflating the total staff with the total

hours of direct labor.  According to the government, direct labor hours are taken into

account for the eligibility calculation, while the number of positions is considered as part

of the employment potential determination and the latter does not involve the 75%

statutory threshold.  The court agrees with the government that the potential employment

determination does not involve the 75% statutory requirement.  CFP has wide discretion

under the regulations to determine whether the work will provide potential employment

for PWSD.  See 41 C.F.R. § 51-2.4(a).  This flexibility allows the AbilityOne program to

include projects both large and small in deciding whether a project will generate

employment for PWSD.  In this case, CFP was presented with ServiceSource's estimate

that it hoped to employ PWSD for around 45 out of 153.66 positions.[18]  Based on

compliance reviews of ServiceSource showing that it was able to achieve its PWSD

---

[17] To the extent that plaintiff argues that ServiceSource applied an improperly overbroad definition of "severely disabled," plaintiff has not identified any instance where ServiceSource actually proposed hiring non-PWSD as PWSD.  While the record indicates that ServiceSource stated that it would seek, among other groups, to hire disabled veterans, who do not necessarily meet the statutory definition of PWSD, it also indicates that ServiceSource will seek to hire disabled veterans who meet the statutory definition.  Further, based on the positive compliance reviews that it had recently performed on ServiceSource, it was reasonable for CFP to determine that ServiceSource would staff the project with PWSD who met the statutory definition.

[18] The government and intervenor argue that NPAs do not always have the resources to conduct the full-scale search that would be required to guarantee PWSD employment, and it would be burdensome to require NPAs to do so before receiving a contract.  This burden is undisputed by plaintiff.

staffing goals on other projects, the court finds that it was rational for CFP to accept and rely on this estimate.  Indeed, CFP found that ServiceSource has operated for 37 years with an agency-level ratio above 76% and frequently rose above 80%, including an 87.2% rating for Fiscal Year 2013, AR 3313.

Regarding the availability of PWSD in the St. Louis area specifically, CFP rationally found that "information submitted by ServiceSource . . . demonstrates the demographic data and sufficient numbers of potentially qualifying individuals in the St. Louis and Arnold, MO areas."  AR 2611-12, 2654-67, 3213.  This, coupled with ServiceSource's plan to work with organizations now supporting PWSD in the St. Louis area was sufficient to support the CFP's finding that the BOS contract had the potential to generate employment for PWSD.  Further, the court finds that CFP rationally found that it was possible for PWSD to obtain the required clearances for work on the BOS contract. ServiceSource's demonstrated record of obtaining clearances for PWSD and staffing contracts requiring such clearances was well-supported.  The record showed that ServiceSource had successfully processed 147 out of 150 security clearances for work on previous contracts, including 21 top secret clearances.  AR 2610-11.  The CFP therefore reasonably concluded that the need for security clearances to work at the St. Louis facility would not be a barrier to finding potential employment for PWSD.

In this connection, the court finds, contrary to plaintiff's contentions, that the decision in Systems Application setting aside an AbilityOne contract is plainly distinguishable from this case.  In that case, the services which PWSD would be hired to perform carried a "risk of encountering unexploded ordinance" and included "disposal of

38

any hazardous and toxic waste" at an Army "live fire range . . . in a remote desert area" that was inaccessible by public transportation.  Systems Application, 107 Fed. Cl. at 797. Employees would be required to be available 24 hours a day.  Id.  Additionally, the proposed AbilityOne contractor in that case, Skookum, did not have any experience with the type of work that would be performed, and "ma[de] no attempt to explain how particular direct labor positions or tasks at the ranges could be done by the severely disabled."  Id. at 805-08.  Moreover, "Army personnel . . . expressed reservations about any . . . AbilityOne contractor being able to successfully meet all the contract requirements."  Id. at 807; see also id. at 808.

In this case, in contrast, the services will be performed during regular business hours[19] and the location is accessible by public transportation.  Further, CFP found that ServiceSource has performed and is currently performing similar work at other locations, AR 3303-09, and has described in detail how the particular direct labor positions could be performed by PWSD, AR 983-86.  Finally, NGA has not expressed reservations about the ability of ServiceSource to perform the work, as the agency did in Systems Applications. Therefore, the court finds that Systems Application is distinguishable from the present case.  For all of these reasons, the court finds that the CFP's conclusion that there is the "potential" to generate work for PWSD is rationally supported.

### ii.  CFP Rationally Determined that ServiceSource Is Capable of Performing the BOS Contract.

---

[19] Some services will be performed outside of those hours, but these will not necessarily be performed by PWSD.

Second, plaintiff argues that the record does not support CFP's determination that ServiceSource was capable of performing the work required by the contract.  Plaintiff argues that ServiceSource lacks this capability for three reasons: (1) that it does not have a ready workforce and plans to hire the incumbent's workforce, (2) that it plans to subcontract work for which it lacks expertise, and (3) that it cannot be ready to perform at the end of the three-month transition period provided for under the contract. Additionally, plaintiff challenges CFP's determination CFP has had prior experience that is similar to the contract at issue here.  Relying on these factors, plaintiff contends that CFP should have found that ServiceSource lacked the capability to perform the contract and thus it should not have been added to the AbilityOne list.

In response, the government argues that (1) CFP rationally found that ServiceSource could properly staff the project, (2) ServiceSource is permitted to subcontract work under the applicable regulations and thus ServiceSource's reliance on subcontractors for some work was not improper, and finally (3) there are sufficient safeguards in the proposed contract to avoid potential issues with regard to the transition, NGA may extend the plaintiff's incumbent contract for six months and provide additional time if necessary to allow for a smooth transition.

The court finds that CFP's determination regarding ServiceSource's capability to perform the BOS required by the contract was rational.  While plaintiff disagrees with CFP's conclusions, it has not demonstrated that the determination was arbitrary, capricious, or contrary to law.  Regarding a ready workforce, CFP properly considered the hiring plan submitted by ServiceSource, including both the proposed strategy and the

40

personnel expertise used by ServiceSource and rationally determined that it was

acceptable.  AR 3212-13; see also AR 2610.  This included specific demographic

information about the region showing that potential employees existed, AR 2611-12,

2651-65, 3213, and letters submitted by five local and state rehabilitation agencies stating

that they would assist ServiceSource in identifying potential employees, AR 2613-20.

Further, plaintiff has not provided any reason to find that the proposed plan would not be

possible, and the court is unaware of any evidence in the record that raises significant

doubts.  To the contrary, the record in this case includes information submitted by

ServiceSource detailing past successes with similar work together with evidence of the

preliminary steps it had taken to find PWSD to meet the needs of the BOS contract.[20]

The court finds that this evidence is enough to find the CFP decision to be rational on this

issue.

      Regarding the permissibility of subcontracting, the plaintiff's objections are also

unsupported. The regulations provide, in relevant part, that

> [NPAs] may subcontract a portion of the process for producing a
> commodity or providing a service on the Procurement List provided that
> the portion of the process retained by the prime nonprofit agency generates

---

[20] Plaintiff also argues that ServiceSource's plan to hire incumbent employees demonstrates that
they are unable to properly staff the contract independently.  However, there is no prohibition on
such a practice, and it is not clear how a plan to hire certain employees demonstrates that
ServiceSource would be unable to hire employees with PWSD for other jobs.  To the extent that
plaintiff seeks to analogize this plan to the plan criticized in Systems Application, the court finds
that the circumstances are factually distinct.  In that case, the court's specific concern with such a
plan was that it appeared that the NPA, Skookum, would seek to reclassify the incumbent
employees as severely disabled in order to reach its goals, which would be contrary to the
statutory definition of "severely disabled."  107 Fed. Cl. at 806.  In this case, ServiceSource has a
specific plan to hire the required number of PWSD separate from its plan to hire incumbent
employees.

> employment for persons who are blind or have other severe disabilities.
> Subcontracting intended to be a routine part of the production of a
> commodity or provision of a service shall be identified to the Committee at
> the time the commodity or service is proposed for addition to the
> Procurement List and any significant changes in the extent of
> subcontracting must be approved in advance by the Committee.

41 C.F.R. § 51-4.4(c).  Additionally, the regulations allow even greater subcontracting

with specific CFP approval.  Id. at § 51-4.4(d).  It is undisputed that the use of

subcontractors in this case was identified to CFP and approved.  Plaintiff argues,

however, that the subcontracting to be performed under ServiceSource's proposal violate

these regulations because it includes subcontracting for all of the Annex 8 Operations and

Maintenance Services and Annex 5 Occupational Health Nurse Services.  According to

plaintiff, each of the 11 services to be performed as part of the BOS contract separately

constitutes a service under the meaning of the regulation, thereby requiring that it be

performed at least in part by ServiceSource.  See Procurement List: Additions, 79 Fed.

Reg. 22,103 (April 21, 2014) (adding the BOS as one complete "service").  While

plaintiff characterizes ServiceSource as subcontracting out "all" of certain services, in

fact those services are part of an overall services contract involving 11 separate service

categories.  Indeed, the overall service that CFP added to the procurement list is BOS as a

whole, not 11 individual additions.  The court agrees with the government that

subcontracting out a portion of the overall services with CFP's approval is permitted by

the regulations and does not provide a basis for overturning the CFP decision.

Regarding plaintiff's objections to the transition period, the court finds that

plaintiff's arguments are without merit.  First, to the extent the plaintiff argues that the

use of a transition period is, in and of itself, contrary to law as it permits the NPA to operate at a lower direct labor ratio than required by the JWOD Act, the court rejects the argument. As discussed above, plaintiff's argument is based on its misreading of the 75% requirement. In fact, CFP policy explicitly permits the use of phase-in plans and only requires that contractors achieve and maintain a 60% direct labor ratio on a particular project by the end of the phase-in period.[21] AR 3173-80, 3221. In this case, CFP rationally relied on ServiceSource's history of meeting phase-in deadlines in other situations to find that using a phase-in plan for this contract would not cause ServiceSource's direct labor ratio to fall below the agency-wide 75% level. AR 3227, 3313-15.

Next, the court also rejects plaintiff's challenge to CFP's conclusion that ServiceSource can perform even though it may need assistance from NGA to provide for a smooth transition, including providing escorts for uncleared personnel. According to plaintiff, such a reliance assumes that NGA will be willing to assist ServiceSource and, if it does not, will result in the inability for the NPA to perform. In this connection, plaintiff's arguments regarding CFP's findings on ServiceSource's ability to obtain security clearances is not supported by the record. CFP noted that clearances for all personnel will not be required on the first day of the contract, and further that it had no reason to doubt ServiceSource's ability to obtain clearances in that ServiceSource had, as

---

[21] In this context, the court notes that ServiceSource's proposal set an ultimate goal of an 80% direct labor ratio following the phase-in period.

discussed above, successfully obtained 147 out of 150 previous clearances, including 21

top secret clearances.[22]  AR 3156, 3301-02.

Finally, the court must reject plaintiff's challenge to the CFP's conclusion that the

ability of PWSD to perform work at the Mark Center supported a finding that

ServiceSource could also perform the NGA contract with PWSD.  Regardless of whether

the work for NGA will require more personnel to obtain security clearances, CFP

rationally concluded that the actual work itself at both facilities appears to be quite

similar in several categories and can be performed by PWSD.  The record indicates that

"[m]embers of the Commission and Commission staff knowledgeable with the

capabilities of people with significant disabilities . . . toured both the Mark Center and the

[NCW] BOS campuses," before reaching these conclusions.  AR 3222; see also AR 3303.

The record reflects that among those who toured the facilities was a CFP member who

"uses a white cane for mobility and has over 40 years' experience in rehabilitation

services for [PWSD]."  AR 3304.  Another CFP member who toured both facilities uses a

walking cane and motorized scooter and served on the board which determined the

minimum standards for public space ability under the Americans with Disabilities Act.

---

[22] Plaintiff implies that it will be more difficult for PWSD to obtain security clearances.
However, there is no evidence for such a proposition.  CFP consulted NGA's Personnel Security
Division in order to obtain specific information about the process TS/SCI security clearance.  AR
3302.  CFP found that a physical disability is not a factor that is considered during the process of
obtaining clearance and that, while emotional, mental, and/or personality disorders are
considered during the process, there is no blanket denial for such individuals.  Id.  In fact, many
of the 21 top secret clearances previously obtained by ServiceSource for PWSD involved
individuals with intellectual disabilities or mental health issues.  AR 2611.  As a result, the
information before CFP reflecting past experience with security clearances was properly
considered regardless of whether the person obtaining said clearance was severely disabled or
not.

AR 3305-06.  After touring both facilities, the group found that "the NGA West BOS

Service appears to be an ideally suitable opportunity for employment for the AbilityOne

workforce, with upward mobility potential."  AR 3308.  The court has been given no

reason to second guess their conclusions here, and finds that it was rational for CFP to

rely on those conclusions.

Importantly, in upholding the CFP's conclusion that ServiceSource can perform

the work, the court is not suggesting that ServiceSource will not suffer serious

repercussions if it later fails to be able to perform the work, either by failing to meet the

employment goals and estimates for PWSD relied on by CFP, by failing to properly

perform the services contracted, or for any other reason.  Instead, the statute and

regulations permit CFP to maintain the procurement list to ensure that services are

properly provided.  Under the regulations, CFP is required to monitor NPAs as they

perform the contracts on the procurement list, 41 C.F.R. § 51-2.2(d), and may, in its

discretion, re-assign contracts or remove contracts from the list entirely if it finds that the

NPA's performance is not satisfactory, 41 U.S.C § 8503(a)(2).  As a result, should

plaintiff's concerns regarding the likelihood of generating employment for PWSD turn

out to be correct or if PWSD cannot perform the work, the existing regulatory structure

provides sufficient recourse for correcting the AbilityOne list.

> ### iii. CFP Rationally Concluded that ServiceSource is Eligible to Participate in the AbilityOne Program.

Third, plaintiff argues that ServiceSource is not eligible for AbilityOne work

because: (1) ServiceSource is not operated in the interest of PWSD, as required by the

JWOD Act, and (2) ServiceSource violates the 75% statutory requirement (even under

CFP's reading of the JWOD).  According to plaintiff, ServiceSource's financial

information for Fiscal Year 2013 shows that 15% of the total sales revenue it received

was paid as wages to PWSD, which plaintiff argues demonstrates that the NPA is not

actually operated in the interest of PWSD.  Plaintiff further argues that ServiceSource's

high PWSD employment ratios for direct labor agency-wide are created through the

manipulation of position labelling.  According to plaintiff, ServiceSource is able to

achieve these ratios by only characterizing positions suitable for PWSD as "direct labor"

positions and categorizing all other positions as "indirect" regardless of whether the labor

is direct or not in order to skew the ratios in its favor.  Plaintiff particularly refers to a

truck driver position performed at the Mark Center, which was categorized as "indirect,"

as an example of such selective labelling.

In response, the government and intervenor argue that there is no evidence to

support plaintiff's contentions.  They argue that the percentage of wages paid does not

reflect other benefits provided and costs incurred as part of running a NPA.  Additionally,

they argue that the rate of payment for PWSD and the number of employees on each

contract is irrelevant to the eligibility determination and thus regardless of whether only

15% of revenues goes to PWSD, if they make up 75% of the direct labor hours, agency-

wide, ServiceSource is eligible.  The government further argues that the most recent

compliance reviews of ServiceSource was positive and did not raise any concerns about

ServiceSource's position-labelling practices.

The court finds that the record supports CFP's conclusion that ServiceSource is a qualified NPA under the terms of the JWOD Act.  In making its determination, CFP relied on a recent "comprehensive compliance review of ServiceSource" that had "found them to have an outstanding rating."  AR 3214.  While this review was conducted in 2011, there does not appear to be any requirement that an NPA be reviewed during every procurement process.  Indeed, as plaintiff notes in its motion, CFP sets an annual goal of conducting on-site reviews for 20% of NPAs.  AR 3665, 3669-70.  Additionally, a NPA also submits an annual report, known as Form 404, which details its eligibility statistics.  ServiceSource filed four such forms in 2013, one for each of its businesses.  AR 8206-13.  The court has been given no basis for questioning the accuracy of those forms.  After this case was filed, the court granted the government's motion to remand the matter to CFP to confirm whether or not ServiceSource was eligibile under the JWOD Act.  Following the remand, CFP sent ServiceSource a letter with 21 questions seeking additional information and clarifications.  AR 8170-74.  Chief among these were requests to verify the information contained in the submitted Form 404.  Id.  CFP asked questions regarding the categorization of services as direct or indirect, questions regarding verification of disability status, questions regarding the percentage of wages paid by ServiceSource to severely disabled employees, and a request for clarification regarding the specific entity within ServiceSource that would be performing the services.  Id.  ServiceSource provided comments and documents in response, after which CFP reaffirmed its original findings.  AR8176-8204, 8608.  In its response, ServiceSource affirmed that the forms it had submitted were accurate and that it applied the statutory definition of "severely disabled"

47

when determining whether employees qualified for such a designation.[23]  AR 8176.

SourceAmerica had also raised specific questions regarding the disability status of two

individuals shown in photos provided to CFP.  ServiceSource confirmed that these

individuals qualified as PWSD and stated that it kept the required records of each

employee's disability status and that severe disabilities are not necessarily obvious from

an individual's physical appearance.  AR 8203.  Regarding the amount of revenues paid

as wages to PWSD, ServiceSource noted that wages are only one part of the funds that it

spends to benefit PWSD.  AR 8198.  According to ServiceSource, substantially more

than 15% of revenues are spent for the benefit of PWSD through health benefits and

community programs, as well as additional expenses required to employ PWSD including

taxes, equipment, and other costs incurred in connection with its contracts.  Id.

Regarding the categorization of certain positions and calculation of the direct labor ratio

at the Mark Center, ServiceSource stated that the truck driver position in question was

properly labelled because it was not a direct labor position required by the contract for

that facility but rather an occasional task performed by a supervisory position on an as-

needed basis.  AR 8202.  ServiceSource also clarified concerns about its earlier statement

that the Mark Center contract employed 20 veterans without disabilities while still

---

[23] Plaintiff raised concerns that ServiceSource sought to apply overly-broad definitions of "severely disabled."  In particular, plaintiff pointed to statements indicating that ServiceSource was interested in hiring disabled persons, even though those individuals would not meet the strict standard set forth under the JWOD Act.  For example, plaintiff noted that a currently-employed disabled person would not qualify as a PWSD since his or her employment would demonstrate employability.  However, there is no prohibition on hiring individuals of any ability, so long as ServiceSource does not count such individuals as severely disabled in its direct labor ratio.  There is no evidence in the record that ServiceSource did so in this case.

achieving a 100% disability ratio by noting that, as the court discussed above, the total

number of employees employed is separate from the calculation of the direct labor ratio,

which is a measurement of hours of specific types of labor.  Id.  As a result,

ServiceSource stated, the total number of employees includes positions that would not be

included in the direct labor ratio calculation.  Id.  Finally, while plaintiff argues that CFP

did not weigh the information provided by ServiceSource correctly, it has not provided

the court with any legal basis to substitute its judgment for that of CFP.[24]

### iv.     CFP Rationally Determined That AID, the Incumbent, Would Not Be Seriously Impacted.

Fourth, plaintiff argues that CFP failed to properly evaluate the severe adverse

impact that adding the BOS to the procurement list would have on AID, the incumbent.

Plaintiff raises two objections: (1) CFP failed to consider AID's status as a continuous

supplier dependent on the revenue, and (2) CFP failed to consider AID's status as an

ANC-owned entity when evaluating the impact.  According to plaintiff, CFP was

required by its regulations to consider AID to be a continuous supplier dependent on the

revenue it received from the contract and that the impact determination should have been

made based on AID alone without regard to the resources of its corporate parent.  Next,

plaintiff argues that CFP erred in finding that the preferences afforded to ANCs under

Federal law did not bar the addition of the BOS to the AbilityOne procurement list.

According to plaintiff, Congress has specified ANCs like AID as economically-

---

[24] Plaintiff also makes numerous arguments regarding the overall administration and oversight of the AbilityOne program.  However, plaintiff has not provided any evidence connecting these criticisms of the overall program to specific legal arguments related to the present case.  As a result, the court declines plaintiff's invitation to extrapolate those criticisms to this case.

disadvantaged for all purposes under Federal law and that, under FAR § 26.102, AID was entitled to receive "the maximum practicable opportunity to participate in performing contracts awarded by Federal agencies," which it argues requires CFP to provide it with preferential treatment under this section of the suitability analysis.

In response, the government and intervenor argue that CFP correctly considered the impact on AID by looking at data from both AID and its parent corporation. According to the government, CFP's regulations expressly allow CFP to determine impact on an incumbent by looking at corporate parent data and that a review of AID's corporate parent's income demonstrates that AID will not be severely impacted.  In this connection, they note that AID refused to submit to CFP AID-specific financial information, thus requiring it to obtain information from publicly-available sources. They also argue that to the extent the plaintiff is challenging CFP's reading of the relevant regulation, CFP's reading is entitled to deference.  They also argue that AID's preference argument is without merit.  While they agree that, as a matter of informal policy, CFP does not add contracts awarded pursuant to a small business preference to the procurement list,[25] it argues that the JWOD Act does not recognize any other Federal

---

[25] CFP has an informal policy, when considering impact, of deferring to incumbent awards made pursuant to the 8(a) preference programs.  According to their website,

> requirements currently set aside under the 8(a) Program can be added to the Procurement List. However, in recognition and support of other socioeconomic initiatives, the Committee's voluntary practice is to refrain from adding projects to the Procurement List that are currently in the 8(a) Program when the incumbent contractor has not yet graduated from the 8(a) Program and/or there is more than one option year remaining on the contract.

contracting preferences and thus does not require CFP to consider AID's status as an

ANC.

The court agrees with the government that CFP rationally and lawfully determined

that AID would not be severely impacted by placing the BOS on the procurement list.

First, contrary to AID's contentions, CFP was authorized and required by its regulations

to consider the revenues of both AID and its parent company in making its impact

determination.  Under CFP's regulations, CFP is to give "particular attention" to "[t]he

possible impact on the contractor's total sales, including the sales of affiliated companies

and parent corporations." 41 C.F.R. § 51-2.4(a)(4)(i)(A) (emphasis added).  It is "that

contractor" that CFP then analyzes to see if it is "more dependent on the income from

such sales to the Government." Id. at § 51-2.4(a)(4)(i)(B).  As a result, it was reasonable

for CFP to consider the revenues of AID's parent corporation in making its impact

determination, and further reasonable for CFP to use publicly-available records when

AID did not supply the requested financial information.  In this analysis, CFP determined

that AID's parent corporation had revenues of $1.8 billion in Fiscal Year 2012.  AR

3228.  Based on this evidence, it was rational for CFP to conclude that AID would not be

seriously impacted.

Second, the court finds that CFP was not required by law to give a preference to

AID as an ANC in making its impact determination under the JWOD Act.  Where

---

AbilityOne Program – About Us: FAQs, http://www.abilityone.org/about_us/faqs.html#18 (last
visited December 4, 2014).  In this case, as noted above, the plaintiff had graduated from the 8(a)
Program prior to the award of the current contract, which was awarded through full and open
competition.

preferences are granted to qualifying businesses, such preferences are identified and given effect in the relevant statute.  See, e.g., 15 U.S.C. §§ 636(j)(10)(J)(ii), 636(j)(11)(B)(iii), 637(a)(4)(A)(i)(II), 637(d), 644(g); 10 U.S.C. § 2323.  The JWOD Act does not include or reference any other statutory preference provisions.  Indeed, the AbilityOne Program is itself a program designed to provide a preference in the circumstances specified by the JWOD for the benefit of PWSD.  Further, the court is not aware of any requirement that CFP must omit from the procurement list contracts where the incumbent enjoys an economically-disadvantaged status by virtue of the Alaska Native Claims Settlement Act.  See Kingdomware Techs., Inc. v. United States, 754 F.3d 923, 925 (Fed. Cir. 2014) ("Unless otherwise specified by statute or regulation, an agency has wide discretion to decide the method of contracting to use" (citing Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009)).

## C.   NGA Did Not Err in Referring the BOS Contract to CFP.

Plaintiff argues that the NGA erred in awarding the BOS contract through the AbilityOne Program to ServiceSource for three primary reasons: (1) NGA improperly relied on CFP's determination, (2) NGA's evaluation of ServiceSource's proposal was flawed, and (3) NGA failed to identify organizational conflicts of interest ("OCI"). Plaintiff's first argument is related to its suitability argument: if CFP's evaluation of ServiceSource was flawed, then NGA's award pursuant to that evaluation was similarly flawed.  Next, plaintiff argues that NGA's independent evaluation of ServiceSource was flawed because the CO's later questions regarding the definition of PWSD indicated a lack of understanding of the AbilityOne program, the CO did not perform a thorough

enough analysis of ServiceSource's proposed plan to obtain security clearances, and the CO was not able to properly evaluate ServiceSource's size, revenues, or previous history based on the information provided by the NPA. According to plaintiff, ServiceSource only provided accurate information about its size and experience on remand and counted subcontractor experience as its own, requiring a reevaluation by NGA before any contract could be awarded. Finally, plaintiff argues that NGA determined that no actual or potential OCI issues existed despite the fact that SourceAmerica, which assisted NGA in its evaluation of ServiceSource, receives a percentage of the total value of the contract. In this connection, plaintiff argues that NGA was ultimately persuaded to contract through the AbilityOne program in order to avoid a full and open selection process and potential bid protests.

In response, the government and intervenor argue that NGA was correct to rely on CFP's evaluation of ServiceSource and that plaintiff has not identified any actual or potential OCI under the definition set forth in the FAR. They argue that NGA's actions are not a required step of the AbilityOne contracting process, thus making them legally irrelevant here. According to the government, because CFP has exclusive statutory authority to manage the procurement list, NGA had to contract through the NPA using CFP's choice once the CFP added the BOS to the procurement list. Further, the government contends that NGA could not have relied on SourceAmerica's evaluation in a way that creates an OCI because NGA completed its evaluation before it received SourceAmerica's evaluation, and even then only received a brief email from SourceAmerica indicating that it had selected ServiceSource as the best option for the

53

BOS contract.  The government argues that CFP also completed an independent analysis of the proposal, thus removing any bias on the part of SourceAmerica from the process.

The court finds that plaintiff's arguments regarding NGA are meritless.  It is undisputed that NGA acted properly in determining that the BOS was a potential candidate for addition to the procurement list.  Plaintiff instead disputes NGA's actions following this identification.  Because CFP is the only authority which oversees the procurement list, 41 U.S.C. § 8503(a)(1), and because a service that is added to the procurement list may only be contracted through the contractor selected by CFP, id. at § 8504(a), NGA's actions are irrelevant.  Indeed, it is undisputed that no actions on NGA's part are required for the addition of the BOS to the procurement list.  Further, CFP could have added the BOS to the AbilityOne list even over the objection of NGA.  Under such circumstances, plaintiff's objections to NGA's actions are without merit.

IV.    **CONCLUSION**

Based on the foregoing, plaintiff's motion for judgment on the administrative record is **DENIED** and the government's and defendant-intervenor's cross-motions for judgment on the administrative record are **GRANTED**.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge